# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Samuel Ankrah, A 40 396 827,<br>    Petitioner<br>v.<br>Alberto Gonzales, Attorney General, et al.,<br>    Respondents | Docket No. 3:06cv544(PCD)<br><br>May 10, 2006 |

## ADDITIONAL EXHIBITS IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

                                                                                              Pg
Transcript of oral decision of IJ, 3/8/06 ........................................................................ 1
Transcript of 3/1/06 hearing ........................................................................................ 8
Transcript of 3/8/06 hearing ...................................................................................... 20

Respectfully submitted for
Petitioner Samuel Ankrah, by

/s/

Justin Conlon,
federal bar ct 26187
Law Offices of Michael Boyle
250 State Street, Unit C2
P.O. Box 335
North Haven, CT 06473
203 239-2299, fax 203 985-8207

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the following was served by electronically on AUSA Douglas Morabito, Office of the U.S. Attorney, 157 Church St., New Haven, CT 06473.


/s/
Justin Conlon



UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
Hartford, Connecticut

File No.:  A 40 396 827                          March 8, 2006

In the Matter of                  )
                                  )
SAMUEL EDWIN NII ANKRA AKRAH      )    IN REMOVAL PROCEEDINGS
                                  )
            Respondent            )

CHARGES:     Section 237(a)(2)(B)(i) of the Immigration and
             Nationality Act - convicted of an offense relating
             to a controlled substance.

             Section 237(a)(2)(A)(iii) of the Immigration and
             Nationality Act - convicted of an aggravated
             felony, trafficking in narcotics and crime of
             violence and sexual abuse of a minor.

APPLICATION:   Motion to terminate.

ON BEHALF OF RESPONDENT:          ON BEHALF OF DHS:

Justin Conlin                     Robert K. Bingham
Law Offices of Michael Boyle      Special Counsel
P.O. Box 335                      Hartford, CT
North Haven, CT  06473

## ORAL DECISION OF THE IMMIGRATION JUDGE

### Introduction

The respondent was placed into removal proceedings based on
a conviction for possession of narcotics, and sexual assault,
second degree.

The respondent had a full hearing.  On August 24, 2005, the
Court denied the respondent's motion to terminate based on a
claim or derivative citizenship, and ordered the respondent's
removal to Ghana.

1

The Court will not reiterate the statement of facts or conclusions of law made by the Court decision on that date.

On January 26, 2006, the Board of Immigration Appeals remanded the matter for a new decision, for the Immigration Judge to obtain any further testimony he may require on specific credibility determinations as to the testimony of the respondent's mother and aunt.

Respondent may also take this opportunity to provide additional information and evidence on this issue.

The only other testimony that was provided was that of the respondent's mother. She was specifically confronted regarding statements made by the respondent's father in conjunction with the respondent's application for an immigrant visa made a the American Embassy in Ghana in April 1984. Specifically, she stated that paragraph 3 of that affidavit, at the last page of the visa packet, was not true. She states that his statement that I accepted responsibility for the pregnancy and that during the period of friendship she became pregnant is not true. She also states that the statement in paragraph 5 that our friendship terminated soon after the birth of said child is also not true.

## Analysis and Findings

The first issue addressed by the Board is that of the credibility of the respondent's mother and aunt. The Court really feels that this is almost an impossible task. The problem is that these are events that took place over 30 years ago. And,

A 40 396 827                              2                        March 8, 2006

anyone's recollection of events that took place so long ago is certainly very difficult, in the Court's mind, to truly evaluate. Now, there certainly is an issue about the weight the Court should give his mother and aunt's testimony versus the affidavit from the respondent's father, that was issued in 1984, which was certainly much more contemporaneous than today. That statement can certainly be interpreted to provide slightly different story, although it is really unclear exactly what he meant by accepting responsibility for the pregnancy, or what the term friendship terminated really meant. Although one could certainly read the statement to indicate that they had a friendship that only ended after the child was born, and the respondent's mother and aunt indicated that the friendship terminated soon after his mother became pregnant.

Certainly, the Court finds that it is very, very difficult to evaluate these witnesses' credibility. However, the Court would note that the statement of the respondent's father was much more close in time to the events in 1975. However, overall, the Court, frankly, finds itself impossible to really make a true credibility finding based on the record before it.

However, the Court does find that it does affect the issue of burden of proof. That also raises the totally ambiguous issue of what caring for a mother means. It certainly could mean different things to different people. And, it is uncertain to the Court what that would mean in the country of Ghana.

A 40 396 827                                    3                         March 8, 2006

However, reading the affidavit from the respondent's father does indicate that, at least, there was a friendship going on while she was pregnant. What that means, the Court does not know. However, the Court is still of the opinion that, based on this record before it, that the respondent, based on this conflicting evidence, still has not met his burden of proof.

The other issue that the Court addressed very carefully, and reviewed the record very carefully again, is that of the real state of law in the country of Ghana. Frankly, the Court finds the law to be ambiguous, at best.

On page 30 of the respondent's submission on what appears to be a law review article on Ghanian family law, there is a statement that legitimacy is secured by the acknowledgment of paternity by the father. It ends with a statement, when one reads about the illegitimate child of a father that must be interpreted to mean a child whose father has refused to acknowledge paternity.

Then, the respondent provided a memo from an attorney in Ghana which brought up the concept of caring for the mother, and the naming of the child. This appears to be based on a statement in the high Court decision in <u>Braun v. Mala</u> (phonetic sp.).

There is a statement on page 50 of the submission saying that, of course, it is generally accepted principle of customary law that a child may be a legitimate child of his father, even though the father never married the mother, depending on whether

A 40 396 827                          4                    March 8, 2006

4

the father cared for the mother during the pregnancy, acknowledged and named the child in accordance with custom applicable for the patuitive father.

Then, there is a reference to Akan (phonetic sp.) laws and customs, which discuss the customs of a particular tribe in Ghana. It mentions the issue about a man caring for the unmarried girl whose baby he stands as the patuitive father, but, then, goes on to indicate that the focus is more on whether the paternity is determinable.

Then, if you go to page 49 of the submission, it makes a statement that whether the respondent is subject to a particular tribal customary law. This seems to indicate that the customary law is really based on the particular tribe involved. Now, the respondent provided some documents that mention the particular tribal naming ceremony. Again, the Court is just not satisfied that this is the particular tribe that the respondent or his father is a part of.

The Court simply is not satisfied that this burden of proof has been met. The Court simply cannot find, based on this record, that the respondent is illegitimate.

The Court acknowledges issues raised in the Board's remand, but, the Court simply cannot, at this time, make a finding that the respondent is a U.S. citizen, based on this record.

If the Board wants to make that finding, it is certainly the Board's prerogative. But, based on this record, as it stands,

A 40 396 827                    5                    March 8, 2006

5



the Court cannot make such a finding.

### ORDERS

IT IS HEREBY ORDERED that the respondent's motion to terminate is denied.

IT IS FURTHER ORDERED that the respondent be removed to Ghana.

MICHAEL W. STRAUS
Immigration Judge

6

## CERTIFICATE PAGE

I hereby certify that the attached proceeding before JUDGE MICHAEL W. STRAUS, in the matter of:

SAMUEL EDWIN NII ANKRA AKRAH

A 40 396 827

Hartford, Connecticut

is an accurate, verbatim transcript of the cassette tape as provided by the Executive Office for Immigration Review and that this is the original transcript thereof for the file of the Executive Office for Immigration Review.

Karen Coen Brooks, Transcriber

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, Maryland  21401
(301) 261-1902

April 27, 2006
(completion date)

By submission of this CERTIFICATE PAGE, the Contractor certifies that a Sony BEC/T-147, 4-channel transcriber or equivalent, as described in Section C, paragraph C.3.3.2 of the contract, was used to transcribe the Record of Proceeding shown in the above paragraph.

 

**U.S. Department of Justice**
Executive Office for Immigration Review
United States Immigration Court

Matter of                                        File A 70 396 827

                                )
                                )
SAMUEL EDWIN NII ANKRA AKRAH     )    In REMOVAL Proceedings
                                )
                                )
                Respondent       )         Transcript of Hearing

Before MICHAEL W. STRAUS, Immigration Judge

Date:  March 1, 2006              Place:  Hartford, Connecticut

Transcribed by FREE STATE REPORTING, INC., at Annapolis, Maryland

Official Interpreter:

Language:

Appearances:

    For the Department of
    Homeland Security:              For the Respondent:

    Leigh Mappelbeck               Justin Conlin

8

1   JUDGE FOR THE RECORD

2       This is Immigration Judge Michael W. Straus.  This is a

3   removal hearing, Hartford, Connecticut, on March 1st, 2006 in the

4   matter of Samuel Edwin Akrah, file number A 40 396 827.

5   Respondent's present by televideo at the Oxford Correctional

6   Facility, Facility at Somers, Connecticut.

7   JUDGE TO MR. CONLIN

8       Present here in Court on behalf of the respondent?

9   MR. CONLIN TO JUDGE

10      Justin Conlin (phonetic sp.).

11  JUDGE TO MS. MAPPLEBECK

12      Present on behalf of the Department of Homeland Security?

13  MS. MAPPLEBECK TO JUDGE

14      Leigh Mapplebeck.

15  JUDGE TO MS. MAPPLEBECK

16      All right.  Well, what shall we do with this case, Ms.

17  Mapplebeck?  I assume you've read the BIA decision?

18  MS. MAPPLEBECK TO JUDGE

19      I read the BIA decision, Judge, but, I wasn't the attorney

20  that was present for the mother's questioning, and I also don't

21  see that the visa package was entered, so, I'd ask that we have

22  one --

23  JUDGE TO MS. MAPPLEBECK

24      Visa package?  Wasn't that part of the record?

25  MR. CONLIN TO JUDGE

A 40 396 827                    1                    March 1, 2006

1        Yes, it was.

2    JUDGE TO MS. MAPPLEBECK

3        I thought it was.

4    MS. MAPPLEBECK TO JUDGE

5        I --

6    JUDGE TO MS. MAPPLEBECK

7        I believe it was.

8    MS. MAPPLEBECK TO JUDGE

9        Okay.  Well, if --

10   JUDGE TO MS. MAPPLEBECK

11       Well, here, let me just double, double check --

12   MS. MAPPLEBECK TO JUDGE

13       Make sure that --

14   JUDGE TO MS. MAPPLEBECK

15       -- that.

16   MS. MAPPLEBECK TO JUDGE

17       -- it's in.

18   JUDGE TO MS. MAPPLEBECK

19       But, I'm pretty sure it was.

20   MR. CONLIN TO JUDGE

21       It's Exhibit No. 10, Your Honor.

22   JUDGE TO MS. MAPPLEBECK

23       I'm pretty sure it was.  Yes.  I think it is.  Let's see.

24   Yes, we just have the whole visa package here, the I-130, the

25   birth certificate, the whole --

A 40 396 827                    2                    March 1, 2006

1    MS. MAPPLEBECK TO JUDGE

2        All right, Judge, then, when I have the opportunity to

3    confer with the attorney that was here for that questioning, and

4    get their opinion on credibility, we can make a commentary on

5    that for the Court's edification.  And, state our position on

6    that.  I didn't think it was going to come down to credibility.

7    But, if it is, I think it's important to have the attorney that

8    conducted that portion of the hearing.  It appears that it was

9    Ms. Flanagan, or Mr. Marley.  I can't tell.

10   JUDGE TO MS. MAPPLEBECK

11       Well --

12   MS. MAPPLEBECK TO JUDGE

13       And, neither were available to me when I go the file this

14   morning.  If you have a detained calendar on Friday, we can do it

15   Friday, Judge.  I'm not looking to delay this any further, but,

16   if the BIA thinks that his tribal custom is --

17   JUDGE TO MS. MAPPLEBECK

18       Well --

19   MS. MAPPLEBECK TO JUDGE

20       -- determinative --

21   JUDGE TO MS. MAPPLEBECK

22       Yes.

23   MS. MAPPLEBECK TO JUDGE

24       -- I need to question, them, Judge.

25   JUDGE TO MS. MAPPLEBECK

A 40 396 827                      3                    March 1, 2006

11

1       I guess I'm a little baffled, I'm supposed to make findings

2  of credibility, and, I, it's really impossible for me to, without

3  sort of --

4  MS. MAPPLEBECK TO JUDGE

5       Well, I mean, I think --

6  JUDGE TO MS. MAPPLEBECK

7       -- how can I find that they're not, I mean --

8  MR. CONLIN TO JUDGE

9       Well, I think basically what the BIA said was is, is that

10  the way that the law was presented by the respondent is correct.

11  And, that basically the only evidence in the record, in terms of

12  whether the respondent's father cared for the mother, and whether

13  the respondent was named according to the tribal custom was the

14  testimony of his mother, and the testimony of his aunt.  And,

15  because --

16  JUDGE TO MR. CONLIN

17       But, he was named by his father, right?  I mean, he was.

18  MR. CONLIN TO JUDGE

19       Well --

20  JUDGE TO MR. CONLIN

21       Or, his father's family.

22  MR. CONLIN TO JUDGE

23       Well, he was given his father's last name, but, the

24  materials in the record show that a, according to the tribes in

25  Ghana, they have actual specific ceremonies that they perform

A 40 396 827                    4                    March 1, 2006

1    when they name a child, where there's some type of a, a ritual

2    done by the tribe.

3    JUDGE TO MR. CONLIN

4        But, what's the ceremony mean?  I mean, what does that mean?

5    MR. CONLIN TO JUDGE

6        Well, I believe it was, it was --

7    JUDGE TO MR. CONLIN

8        I mean, do you send out --

9    MR. CONLIN TO JUDGE

10       -- mentioned --

11   JUDGE TO MR. CONLIN

12       -- invitations, do you --

13   MR. CONLIN TO JUDGE

14       Well, no, I believe it was --

15   JUDGE TO MR. CONLIN

16       -- I mean --

17   MR. CONLIN TO JUDGE

18       I believe it's discussed in --

19   JUDGE TO MR. CONLIN

20       No, I know you discuss it --

21   MR. CONLIN TO JUDGE

22       Yes.

23   JUDGE TO MR. CONLIN

24       -- but, then, what's the ceremony, what's, see, see, why I'm

25   having such difficulty with this case is what is caring for a

A 40 396 827                      5                     March 1, 2006

13

1   child mean?  I mean, I think it can mean may things, depending on

2   what culture you're in, and --

3   MR. CONLIN TO JUDGE

4       Yes, I would --

5   JUDGE TO MR. CONLIN

6       -- it's such a nebulous, the whole, the whole thing is so

7   nebulous.

8   MR. CONLIN TO JUDGE

9       Yes, I would agree.  But, I think, in this case, whatever

10  definition you use of caring doesn't apply, because, in this

11  case, when the respondent's father found out his mother was

12  pregnant, he refused to acknowledge that the respondent was his

13  son, and, basically, stayed away from him, and never provided the

14  money, any, never provided the mother any money.  Never went and

15  stayed with her.  And, basically, once the father found out she

16  was pregnant, he never saw her again, until sometime after the

17  respondent was born.  So, I would say, when you have absolutely

18  no contact with the mother, no financial support, there is no

19  way, under any definition, you can say that that is caring for a

20  mother when she's pregnant, when you completely ignore them,

21  refuse to acknowledge that it's your son, and refuse to

22  financially support them, you know, no matter what definition you

23  use of the term cared for, there's no way that that could fall

24  under that definition.  And, then, in terms of the --

25  JUDGE TO MR. CONLIN

A 40 396 827                        6                     March 1, 2006

14

```
 1          But, I --

 2     MR. CONLIN TO JUDGE

 3          -- record --

 4     JUDGE TO MR. CONLIN

 5          -- but, I, but, I guess there is some conflict in this

 6     record, because his own affidavit, the father's own notarized

 7     affidavit says during the period of our friendship, she became

 8     pregnant, and I accepted responsibility for the pregnancy.  Now,

 9     I don't know what that means, but --

10     MR. CONLIN TO JUDGE

11          Well, the --

12     MS. MAPPLEBECK TO JUDGE

13          It --

14     MR. CONLIN TO JUDGE

15          Well, I was just going to say, I believe, of what the mother

16     testified to is that sometime after the respondent was born, the

17     respondent's mother brought the respondent, as a baby, to the

18     respondent's father's mother, respondent's grandmother, and the

19     respondent's grandmother looked at the respondent and said, hey,

20     son, this is your son.  You need to acknowledge that this is your

21     son.  And, at that point, the respondent's father acknowledged

22     that the respondent is his son.  But, that was after he was born.

23     I believe the statement from the respondent's father doesn't

24     specifically say when he acknowledged he was his son.  So, I

25     would say there isn't a conflict between that and the testimony
```

15

1   of the respondent's mother.

2   JUDGE TO MR. CONLIN

3       Well, except, with the exception of our friendship

4   terminated soon after the birth of the child, and, she testified

5   it was like right when she got pregnant, so, I don't know.  I

6   don't know.  See, see, I mean, this I, I, I just think the Board

7   puts me in an almost possible position.  I, I, I don't know

8   whether they're not telling the, it's impossible.  That's just

9   the way I see it.  I mean, I don't see how I can evaluate their

10  credibility, of course, you know, of course they might say this,

11  because that might be favorable.  But, there's no way for me,

12  except for this affidavit from the father, to really --

13  MR. CONLIN TO JUDGE

14      Well, I mean, I would that, I mean, you could evaluate it in

15  the same way --

16  JUDGE TO MR. CONLIN

17      I mean, I don't know --

18  MR. CONLIN TO JUDGE

19      -- that you would in an asylum case, when there's not too

20  much background country condition evidence.  You know --

21  JUDGE TO MR. CONLIN

22      Yes.

23  MR. CONLIN TO JUDGE

24      -- demeanor --

25  JUDGE TO MR. CONLIN

A 40 396 827                    8                    March 1, 2006

16

1       Yes.

2    MR. CONLIN TO JUDGE

3       -- you know, and, sort of none, and, what the respondent
4    would point out is that, you know, before, there were no issues
5    raised, credibility, DHS never said on the record that they
6    thought the person was lying, never said you should deny this,
7    because the respondent's mother or  aunt are not being credible.
8    So --

9    MS. MAPPLEBECK TO JUDGE

10      Which is precisely why I said the attorney that was here to
11   hear that, to make a commentary on our position on credibility
12   should be consulted, particularly in light of the respondent's
13   father's affidavit saying he accepted responsibility for the
14   pregnancy, that the visa package contains his birth certificate,
15   where the father is named, where there is a baptismal certificate
16   whether the father is named, and where he had to file a formal
17   affidavit giving up his parental rights, or assenting to his
18   Immigration to the United States, Judge.  If this aggravated
19   felon is going to be determined a citizen based on a nebulous
20   Ghanian tribal concept, which I have, we have one page 20, and
21   not the page 21 that follows, on, on this concept of things went
22   from five months, or six months during a pregnancy, I, I think
23   that you can't just toss up your hands at credibility.  I think
24   it needs to be re-examined, if that's what the Board really
25   wants, because, based on the record right now, with the paper

A 40 396 827                    9                  March 1, 2006

17

1   evidence, the four corners, the affidavit --

2   JUDGE TO MS. MAPPLEBECK

3        All right.

4   MS. MAPPLEBECK TO JUDGE

5        -- and the Notice to Appear, Judge --

6   JUDGE TO MS. MAPPLEBECK

7        All right, should those two witnesses show up next

8   Wednesday, then?   That's what I'm asking you.   I mean, that's,

9   that, just to be fair to Mr. Conlin, I mean, should the witnesses

10  show up?

11  MS. MAPPLEBECK TO JUDGE

12       Sure.

13  JUDGE TO MS. MAPPLEBECK

14       Okay.

15  MR. CONLIN TO JUDGE

16       Okay.   Well, I can have the mother show up --

17  JUDGE TO MR. CONLIN

18       And, then we can resolve this matter --

19  MR. CONLIN TO JUDGE

20       Okay.

21  JUDGE TO MR. CONLIN

22       -- one, one way or the other.

23  MR. CONLIN TO JUDGE

24       I'm not sure about, because, believe the aunt of the

25  respondent lives in Texas --

A 40 396 827                    10                    March 1, 2006

1    JUDGE TO MR. CONLIN

2        Um-hum.

3    MR. CONLIN TO JUDGE

4        -- so, I'll speak to her, and see if she would be available.

5    She might be available telephonically.  I'm not sure, if, you

6    know, I mean, one week's time to come from Texas to Connecticut

7    is a, you know, is kind of a big deal.

8    JUDGE TO MR. CONLIN

9        All right.  We'll set it over for next Wednesday at 9

10   o'clock, and, hopefully, resolve the matter one, one way or the

11   other.  Okay?

12   MS. MAPPLEBECK TO JUDGE

13       Okay.

14   JUDGE FOR THE RECORD

15       Matter is adjourned.

16                          HEARING ADJOURNED

17

18

19

20

21

22

23

24

25


A 40 396 827                    11                    March 1, 2006



**U.S. Department of Justice**
Executive Office for Immigration Review
United States Immigration Court

Matter of

File A 70 396 827

SAMUEL EDWIN NII ANKRA AKRAH          )  In REMOVAL Proceedings

                          Respondent  )      Transcript of Hearing

Before MICHAEL W. STRAUS, Immigration Judge

Date:  March 8, 2006                Place:  Hartford, Connecticut

Transcribed by FREE STATE REPORTING, INC., at Annapolis, Maryland

Official Interpreter:

Language:

Appearances:

    For the Department of
    Homeland Security:              For the Respondent:

    Robert T. Bingham               Justin Conlin

1    JUDGE FOR THE RECORD

2        This is Immigration Judge Michael W. Straus.  This is a

3    removal hearing, Hartford, Connecticut, on March 8, 2006 in the

4    matter of Samuel Akrah, file number A 40 396 827.  Respondent's

5    present by televideo at the Oxford Correctional Facility,

6    Facility at Somers, Connecticut.

7    JUDGE TO MR. CONLIN

8        Present here in Court on behalf of the respondent?

9    MR. CONLIN TO JUDGE

10       Justin Conlin.

11   JUDGE TO MR. BINGHAM

12       Present on behalf of the Department of Homeland Security?

13   MR. BINGHAM TO JUDGE

14       Robert T. Bingham.

15   JUDGE TO MR. CONLIN AND MR. BINGHAM

16       All right.

17   JUDGE TO MR. CONLIN

18       Mr. Conlin, I, since the last hearing, I really looked.  I

19   sort of took a new look at this whole case.

20   MR. CONLIN TO JUDGE

21       Um-hum.

22   JUDGE TO MR. CONLIN

23       And, I guess my question is, I mean, apart from that memo

24   you got from the law firm in Ghana, I mean, this rule, this so-

25   called rule, about whether he's legitimated or not, I mean, where

A 40 396 827                    12                  March 8, 2006

21

1    does it really come from?

2    MR. CONLIN TO JUDGE

3        Well, I think --

4    JUDGE TO MR. CONLIN

5        Because I looked, I looked carefully at the decisions that

6    they cite from the high Court of Ghana, and --

7    MR. CONLIN TO JUDGE

8        I think it comes from the decisions.  Let me just go back.

9    Yes, I believe, let's see, it would be Exhibit, the Exhibit

10   submitted on the 19th of August 2005.  I'm not sure what the --

11   JUDGE TO MR. CONLIN

12       Right.

13   MR. CONLIN TO JUDGE

14       -- Tabs B and A.

15   JUDGE TO MR. CONLIN

16       Right.  But, I mean --

17   MR. CONLIN TO JUDGE

18       Yes.  I mean, page 50, it says, you know, it's generally

19   considered principle of customary law that a child may be

20   legitimate depending on whether the father cared for the mother

21   during the pregnancy, acknowledged and named the child in

22   accordance with the custom applicable to the father.  So, I mean,

23   this case --

24   JUDGE TO MR. CONLIN

25       But, I mean, customary law, this customary law that they're

A 40 396 827                    13                    March 8, 2006

22

```
 1    talking about really is, can depend on the tribe, it can depend

 2    on a lot of things.  There's no straight customary law, really,

 3    is there?  I mean --

 4    MR. CONLIN TO JUDGE

 5        Well --

 6    JUDGE TO MR. CONLIN

 7        -- the I could see?  I --

 8    MR. CONLIN TO JUDGE

 9        Well, I mean, I think the BIA said that there is no, I mean,

10    the, basically --

11    JUDGE TO MR. CONLIN

12        I'm not --

13    MR. CONLIN TO JUDGE

14        -- I think what the BIA said is that --

15    JUDGE TO MR. CONLIN

16        Because the, because, in the sentence before, on page 49 of

17    that Exhibit, it --

18    MR. CONLIN TO JUDGE

19        Um-hum.

20    JUDGE TO MR. CONLIN

21        -- whether he's subject to Gah (phonetic sp.), you know, all

22    these various tribal customary law is, is, is not know.

23    MR. CONLIN TO JUDGE

24        Well --

25    JUDGE TO MR. CONLIN
```

A 40 396 827                        14                    March 8, 2006

23

1      I mean, there's not one customary law, though.  Is there,
2   really?

3   MR. CONLIN TO JUDGE

4      Well, I think each tribe would have their own, their own
5   rules, and, I believe the, that the, the memo from the lawyer
6   specifically references the tribes, and, I believe, in the
7   testimony --

8   JUDGE TO MR. CONLIN

9      Right.

10  MR. CONLIN TO JUDGE

11     -- it specifically referenced the tribes that the --

12  JUDGE TO MR. CONLIN

13     All right, but, we don't know what the customary law for
14  those, was it Gah, was it the Gah tribe, or some other tribe he
15  had mentioned?

16  MR. CONLIN TO JUDGE

17     I believe it was mentioned in the, the, the, a few pages
18  before that, the family law in Ghana, the excerpts from that
19  book.

20  JUDGE TO MR. CONLIN

21     All right.

22  MR. CONLIN TO JUDGE

23     That --

24  JUDGE TO MR. CONLIN

25     But, I mean, okay, I, I think this is the sentence that

24

1    you're relying on.  This is the top of this, page 50 --

2    MR. CONLIN TO JUDGE

3        50.

4    JUDGE TO MR. CONLIN

5        -- of Exhibit No. 3 here.  And, it says it is generally

6    accepted principal of customary law that a child a may be a

7    legitimate of his child even though the said father never married

8    the mother, depending on whether the patuitive (phonetic sp.)

9    father cared for the mother during the pregnancy, acknowledged

10   and named he child in accordance with the custom applicable, but

11   we don't know what the custom is, do we?  I mean --

12   MR. CONLIN TO JUDGE

13       Well, I think we do, because I, I, I think in the few pages

14   before, in the family law excerpts, lists the customs, and I

15   believe --

16   JUDGE TO MR. CONLIN

17       You give me a page, so we --

18   MR. CONLIN TO JUDGE

19       It, it, the pages are 33 to --

20   JUDGE TO MR. CONLIN

21       Okay.

22   MR. CONLIN TO JUDGE

23       -- 40, and I believe --

24   JUDGE TO MR. CONLIN

25       But, I mean, look on page 30 of that same thing.

A 40 396 827                    16                    March 8, 2006

1    MR. CONLIN TO JUDGE

2        Um-hum.

3    JUDGE TO MR. CONLIN

4        It says in Ghana, it may be said that legitimacy is secured

5    by the acknowledgment of paternity by the father.  That seems to

6    say something else.

7    MR. CONLIN TO JUDGE

8        Well, but, I, well, but, I think what the, what the case

9    says is that acknowledgment in Ghana is not the same thing as

10   acknowledgment in the United States.  That the word

11   acknowledgment doesn't just mean, at some point, yes, I admit

12   that he's my son, acknowledgment means caring for the mother

13   during the pregnancy, and also naming the child in accordance

14   with the tribal customs.  And, I also would point out that the,

15   you know, basically, the BIA said that they felt that those were

16   the standards.  I mean, in the BIA decision, it says all the

17   evidence indicates that a child born out of wedlock in Ghana is

18   considered legitimate when the father acknowledges paternity,

19   and, that is done through caring for the mother during the

20   pregnancy, and naming the, you know, and properly naming the

21   child through the cultural ceremony after birth.  So, I think,

22   basically, the BIA said that the evidence the respondent

23   submitted was clear and, in showing what the requirements are

24   for, for legitimation in Ghana.

25   JUDGE TO MR. CONLIN

A 40 396 827                    17                    March 8, 2006

26

```
 1      And, then, there's this other case.  You go to page 55.

 2   MR. CONLIN TO JUDGE

 3      Um-hum.

 4   JUDGE TO MR. CONLIN

 5      Illegitimacy is strictly unknown under, there's this

 6   discussion between customary, marriage and strict marriages

 7   and --

 8   MR. CONLIN TO JUDGE

 9      Um-hum.

10   JUDGE TO MR. CONLIN

11      I mean, this, this doesn't seem to be black letter law to

12   me.  That's, that's what I'm saying.

13   MR. CONLIN TO JUDGE

14      Okay.  Well, well, I mean, but, I would say that, that, you

15   know, the BIA said that they thought that it was, and, you know,

16   sort of, ultimately, the BIA is the final authority on this issue

17   at this point.  So, if the BIA says that they think that the rule

18   is clear, then, I think the Court is bound by what the, you know,

19   by the law of the case, what the BIA said in the case.  And, the,

20   you know, the BIA remanded the case because they thought that the

21   law was clear, and that the only issue was whether the

22   respondent's mother and sister testified credibly about what

23   they, you know, about what happened when the respondent's mother

24   was pregnant, and, and, shortly thereafter.  And, essentially, I

25   mean, what the BIA said, if the mother and the sister are
```

A 40 396 827                    18                    March 8, 2006

1    credible, then, the respondent is a U.S. citizen.  And, if

2    they're not credible, then, he's not a U.S. citizen.  And, I

3    mean, you know, because the BIA, you know, basically said, you

4    know, this is what the law is in Ghana, I mean, I think the Court

5    and the parties are bound by what the BIA ruled.

6    JUDGE TO MR. BINGHAM

7         Mr. Bingham, is there anything else you want to add?  I know

8    that Ms. Mapplebeck punted on this case, so, I guess, Mr. Marley

9    was doing the case, originally.  He's, I guess not here.

10   MR. BINGHAM TO JUDGE

11        I, I see the BIA did make the word credible emphasized on

12   page 2.  The remaining question --

13   JUDGE TO MR. BINGHAM

14        Right.

15   MR. BINGHAM TO JUDGE

16        -- the bottom paragraph is whether the respondent provided

17   credible evidence that the father did not employ aforementioned

18   mechanisms.  So, if the BIA says that's the only issue, I, it

19   seems to me this is a limited remand to the --

20   JUDGE TO MR. BINGHAM

21        Um-hum.

22   MR. BINGHAM TO JUDGE

23        -- issue.

24   JUDGE TO MR. BINGHAM

25        Well --

A 40 396 827                    19                    March 8, 2006

28

1   MR. BINGHAM TO JUDGE

2       I, I mean, as far as the testimony of the mother and the

3   aunt, I, I have no objection to do that de novo.

4   JUDGE TO MR. BINGHAM

5       Well, I, the only question I would, I would literally have

6   one question of it, and, and, it just relates to some of the

7   statements made by the father, I believe he said something, in

8   the father's affidavit, but, I don't see the point of having, you

9   know, I think it's so, it, I don't know how I can properly

10  evaluate their credibility.  I mean, I think it's --

11  MR. CONLIN TO JUDGE

12      Well, I mean, I think you could do it in the same way, like

13  I said at the last hearing.  I think you could do it in the same

14  way that you do an, you know, on asylee, that doesn't really have

15  any corroborating evidence.  I mean, you know, in that kind of a

16  situation, you know, the Court has to look at the testimony by

17  itself, and determined whether it's credible or not.  I mean, I

18  don't, I mean, I think you could do that in the same, the same

19  way in this case.  And, then, also, I would point out, because

20  the, I believe the respondent's mother testified that the father

21  was half Gah and half Ianwo (phonetic sp.) tribe.  And, page 39

22  and 40 lists the naming ceremony for the Ianwo tribe, which --

23  JUDGE TO MR. CONLIN

24      Yes, but, you don't know which one that would, I don't know.

25  This is, All right, so, is the mother here?

A 40 396 827                    20                    March 8, 2006

 1   MR. CONLIN TO JUDGE

 2        Yes.  And, the, the aunt, unfortunately, because she lives

 3   in Texas --

 4   JUDGE TO MR. CONLIN

 5        I don't --

 6   MR. CONLIN TO JUDGE

 7        -- wasn't able to come --

 8   JUDGE TO MR. CONLIN

 9        -- her aunt's --

10   MR. CONLIN TO JUDGE

11        Okay.

12   JUDGE TO MR. CONLIN

13        -- aunt's testimony is --

14   MR. CONLIN TO JUDGE

15        Okay.

16   JUDGE TO MR. CONLIN

17        -- you know, really going to make any difference.  All

18   right.  Well, since the only piece of evidence that we have is

19   the affidavit from his father, that's the only questions I could

20   ask her, really, is regard to the statements he made on the

21   affidavit and --

22   MR. CONLIN TO JUDGE

23        Okay.

24   JUDGE TO MR. CONLIN

25        -- that's it.  I, I, I don't see the point of further, I

A 40 396 827                      21                    March 8, 2006

30

1    mean, she's already testified.  I'm not going to have her testify

2    again over --

3    MR. CONLIN TO JUDGE

4        Exactly.  I mean, I don't --

5    JUDGE TO MR. CONLIN

6        -- over the same stuff.

7    MR. CONLIN TO JUDGE

8        Yes, there's no need to repeat the whole testimony again.

9    JUDGE TO MR. CONLIN

10       Okay.

11   JUDGE TO MS. DEWUSKU

12       Q.   Do you want to come up here.

13   JUDGE TO MR. CONLIN

14       What happened to the chair, did a devil take it.

15   MR. BINGHAM TO JUDGE

16       Do you want me to put this one?

17   JUDGE TO MS. DEWUSKU

18       Q.   You can sit, you can sit next to the attorney.  That's

19   fine.  Okay.  Ma'am, could you raise your right hand?  Do you

20   swear to tell the truth, and nothing but the truth, so help you

21   God?

22       A.   Yes, I do.

23       Q.   Okay.  And, what's your name again?

24       A.   My name is Della Dewusku (phonetic sp.).

25       Q.   Okay.  All right.  I'm just talking about an affidavit

A 40 396 827                    22                    March 8, 2006

1    that Peter (phonetic sp.), your son's father made, and, I'm sure

2    your attorney showed it to you.  It was made before the --

3    JUDGE TO MR. CONLIN

4         Do you, do you want to show her the statement?

5    MR. CONLIN TO JUDGE

6         Yes.

7    JUDGE TO MS. DEWUSKU

8         Q.    This is the one.  Yes.

9    JUDGE TO MR. CONLIN

10        Let's make sure we're on the same page here.

11   MR. CONLIN TO JUDGE

12        This is from the DHS office --

13   JUDGE TO MR. CONLIN

14        Yes.

15   MR. CONLIN TO JUDGE

16        -- correct?

17   JUDGE TO MR. CONLIN

18        Yes.  And, it has her, a, a declaration he made.  And, this

19   was submitted, I guess, in conjunction with the immigrant visa.

20   MR. CONLIN TO JUDGE

21        Okay.

22   JUDGE TO MR. CONLIN

23        I just want to make sure she sess that.

24   MR. CONLIN TO JUDGE

25        Copy, okay, here it is, the last page.  Okay.

A 40 396 827                    23                  March 8, 2006

```
 1    JUDGE TO MR. CONLIN

 2         All right.

 3    JUDGE TO MS. DEWUSKU

 4         Q.   So --

 5    MR. CONLIN TO JUDGE

 6         Oh, she just wanted to get her glasses.

 7    JUDGE TO MR. CONLIN

 8         Sure.  Of course.

 9    JUDGE TO MS. DEWUSKU

10         Q.   Sure.  Um-hum.  I'll give you a second to read it.

11    JUDGE TO MR. BINGHAM

12         And, this is the, the last page of the immigrant visa

13    package.

14    MR. BINGHAM TO JUDGE

15         Yes, thank you.

16    JUDGE TO MR. BINGHAM

17         This was, yes, the --

18    MR. BINGHAM TO JUDGE

19         Yes, here it is.

20    JUDGE TO MS. DEWUSKU

21         Q.   Did you read it?

22         A.   Yes, sir.

23         Q.   Okay.  I'm just going to mention a couple of things he

24    said here, and, this is, to be done, you know, over 20 years ago.

25    He says that during the period of our friendship, she became
```

A 40 396 827                    24                  March 8, 2006

1    pregnant, and I accepted responsibility for the pregnancy.  What

2    do you, what do you think about that statement?

3         A.   That wasn't true.

4         Q.   It's not true?

5         A.   No.

6         Q.   Okay.  And, it says, I, the father, named the child

7    Samuel Edwin Nii Ankra Akrah.  Is that statement true?

8         A.   That actually was directed by his mother to do so.

9         Q.   He was directed by his mother to do so.

10        A.   Yes.

11        Q.   But, he still named the child.  Right?

12        A.   Yes.

13        Q.   He did.  So, that's true.

14        A.   Yes.

15        Q.   Okay.  Okay.  Number 5.  Our friendship terminated soon

16   after the birth of the child.  Is that true or not true?

17        A.   Not true.  Because I didn't see him when I was,

18   throughout my pregnancy, even before I delivered.

19        Q.   All right.  Okay.  So, you're basically saying 5 isn't

20   true, and 3 isn't true.  Okay.  Now, why would he, I mean, he

21   wrote this over 20 years ago.  Why would he say something in

22   there that isn't true?  What reason do you think there would be?

23        A.   Because, well, I remember, when I, I was young, and,

24   he, when I was, he was in school.  He was in school when I was

25   pregnant.  And, my grandmother took me to his parents' house to

A 40 396 827                    25                    March 8, 2006

34

1    talk to them about the pregnancy.  So, they notified him.  And

2    his grandma told me he is going to, she is going to talk to him,

3    and find out if he is the, I mean, the, he's the one who

4    impregnated me.  And, after that, I didn't hear from anyone.

5    And, I tried to talk to him myself, but, I, I couldn't go there

6    to visit him, I --

7         Q.   I understand that's your part of the story.  And you

8    testified to that --

9         A.   Yes.

10        Q.   -- earlier.  But, but, that's not my question so much.

11        A.   Okay.

12        Q.   So, listen carefully to my question.  You're saying

13   those statements, some of those statement she made in this sworn

14   affidavit are not true.  Why would he fabricate, why would he say

15   things in that statement that aren't true, if you know.  And,

16   maybe you don't know.

17        A.   I really, I wouldn't know.  I really don't, maybe he's

18   just trying to write something.

19        Q.   Because, you understand my situation.

20        A.   Yes.

21        Q.   It's very hard to evaluate what you're saying is the

22   truth, and, he wrote this, you know, over 20 years ago.  And, my,

23   and I'm just trying to figure out who's telling the truth.  And,

24   of course, you have a, you know, since, I mean, let's face it,

25   you have a, a interest in not having your son deported.  So, you

35

1    know, how do I know what, you know, that's, that's my quandary.

2    That's all.

3         A.    I wouldn't, I didn't, really don't know how he wrote

4    these things here.

5         Q.    Um-hum.  Okay.

6    JUDGE TO MR. CONLIN AND MR. BINGHAM

7         I don't have any other questions.

8    JUDGE TO MR. CONLIN

9         Do you have any questions?

10   MR. CONLIN TO JUDGE

11        I just have a few questions.  Okay.

12   MR. CONLIN TO MS. DEWUSKU

13        Q.    So, in paragraph 3, Peter says that he accepted

14   responsibility for Samuel being your child.  And, did Peter

15   eventually accept that Samuel was his son?

16        A.    No.  No.  His mother was the one who took the baby and

17   check him, and said he's our child.

18        Q.    Okay.  And, but, sometime after his mother said Samuel

19   is your son, did Peter, at that point, accept that he was his

20   son?

21        A.    There was none, no discussion between me and him for,

22   if he accepted the baby or not.  He just said, well, I can do

23   nothing about this.  So, it's, he thought I have another friend,

24   that was why, that was what, like, it was very difficult for all

25   this things that is written down, for me to answer them.  I

A 40 396 827                    27                    March 8, 2006

36

1   really don't have any contact with him when I was pregnant.  And

2   when I had the baby.  So, I wouldn't know why he put all this

3   down.

4        Q.   Okay.  So, you're not, well, so, you're not sure,

5   sometime after Peter's mother accepted that the, the child was

6   his, you're not sure what his thoughts were after that.

7        A.   Yes.

8        Q.   Okay.  And, do you know exactly how this letter was

9   obtained?

10       A.   I don't know.  I have, I wasn't around when this was

11  written, so --

12       Q.   Okay.  Now, I think you testified at the last hearing

13  that when you were pregnant, there was a meeting with Peter,

14  where, basically, you said I'm pregnant.  And, this is your

15  child.  And, he just, basically, walked away.  Is that --

16       A.   Something like that.

17       Q.   Okay.  Now, did he specifically say at that point, I'm

18  not going to be your friend any more, or, sort of, how did it

19  end?

20       A.   Well, for him not accepting, I mean, not being there

21  for me throughout my pregnancy, I just (indiscernible).

22       Q.   Okay.  But, Peter didn't specifically say I'm not going

23  to be your friend any more?  I'm not going to see you any more?

24       A.   We never talk about anything.

25       Q.   Okay.

A 40 396 827                    28                    March 8, 2006

37

1    A.   And, he never came to us, of course, his mother wasn't

2    sure that was the baby, until she checked the baby out.

3    Q.   Okay.

4    MR. CONLIN TO JUDGE

5         No further questions.

6    JUDGE TO MR. BINGHAM

7         Mr. Bingham, any questions?

8    MR. BINGHAM TO JUDGE

9         Yes.

10   MR. BINGHAM TO MS. DEWUSKU

11   Q.   Ma'am, the birth certificate has Peter's name on it as

12   the father, right?

13   A.   Yes, sir.

14   Q.   And, how did his name get on that birth certificate?

15   A.   I was his mother.

16   Q.   So, you, you acknowledged him to be the father, right?

17   A.   Yes.

18   Q.   And, that was in October, on October 5th, 1975?

19   A.   That's when he was born.

20   Q.   Pardon me?

21   A.   That's when he was born.

22   Q.   Right.   And, then, later on, you had, you and Peter had

23   the son baptized?

24   A.   Well, his mother, in, did that.  Yes.

25   Q.   Well, your, the baptism occurred about three months

A 40 396 827                    29                    March 8, 2006

38

1    later, in December.  Right?

2        A.    I believe so.  I don't remember exactly.

3        Q.    1975.

4        A.    Yes.

5        Q.    And, Peter, his name got on the baptismal testimonial

6    at that time, also.

7        A.    Yes, sir.

8        Q.    Right?

9        A.    But, his mother did that.

10       Q.    Right.  And, you had a friend, a godparent being Philip

11   Aporche (phonetic sp.).  Is that right?

12       A.    That's from Peter's mother's side.

13       Q.    From Peter's mother's side, your godparent was Philip.

14   Right?

15       A.    I think so.  I'm not too sure.  I don't, it was --

16       Q.    So --

17       A.    It --

18       Q.    So, he must have been there, also, right?

19       A.    Actually, I don't really remember everything that

20   happened, because I went, his mother request for me to bring the

21   baby down to Kitha (phonetic sp.), which I did, and, that's when

22   she decided to give the child a, a name.

23   MR. BINGHAM TO JUDGE

24       Now, does the Court have this in the Exhibits, Your Honor,

25   the baptismal record?

A 40 396 827                    30                    March 8, 2006

39

1    MR. CONLIN TO JUDGE

2        I believe so, yes.  Yes.

3    JUDGE TO MR. BINGHAM

4        I have the whole immigrant visa --

5    MR. BINGHAM TO JUDGE

6        Okay.

7    JUDGE TO MR. BINGHAM

8        -- packet.

9    MR. BINGHAM TO JUDGE

10       Very well.

11   JUDGE TO MR. BINGHAM

12       I do have it.  Yes.

13   MR. BINGHAM TO MS. DEWUSKU

14       Q.   And, and, then, also, Peter allowed you to bring his

15   son to this country.  Didn't he?

16       A.   He did, because I was leaving in Ghana, I have nobody

17   else to leave the child to.  So, his mother was taking care of

18   him, while I, when I came here.  And, for me to bring him over,

19   he had to give the child to a friend, who was going to do all the

20   documents for him to come to join me here.  And, that's how, the

21   only way he can do it, to sign it, the documentary for him to

22   allow him to come over.

23       Q.   Right.  So, you actually got Peter's signature to

24   consent to this.  Right?

25       A.   Yes, because that's, he was in his custody then.

A 40 396 827                     31                    March 8, 2006

```
 1      Q.    And, it's true that he is the natural father.  Right?

 2      A.    To me, I know, but, he doesn't think so.

 3      Q.    Well, he, he acknowledged that I am the natural father

 4   of Samuel.  Right?

 5      A.    Yes, sir.

 6      Q.    And, he did this under oath, on this consent form.

 7   Didn't he?

 8      A.    He sure did.

 9      Q.    And, that, what year was that?  Was that in 1986?

10      A.    Yes.

11      Q.    I mean, that was a long time after the baptism.  Right?

12      A.    Yes, sir.

13      Q.    Okay, about 10 years, 11 years later.  Right?

14      A.    Yes, sir.

15      Q.    Thank you.

16   MR. BINGHAM TO JUDGE

17      I, I guess that's about all, Your Honor.

18   JUDGE TO MR. BINGHAM

19      All right.

20   JUDGE TO MR. CONLIN

21      Any other issues?

22   MR. CONLIN TO JUDGE

23      Well, I think the respondent, you know, would just say that

24   clearly, the credibility of his mother and his aunt was an issue

25   at the last hearing.  The legal theory that the respondent
```

A 40 396 827                    32                    March 8, 2006

1    presented at the last hearing was based on their credibility.
2    And DHS, you know, and the Court, you know, had a full
3    opportunity to examine their credibility.  I think it would be
4    kind of strange for, you know, for DHS or the Court to all of a
5    sudden say they're not credible, at this point, when the
6    credibility was never made an issue before.  And, no one ever
7    raised an issue of their credibility before.  Then, you know, in
8    terms of this letter from the respondent's father, I would say
9    that the testimony of the respondent's mother and aunt is not
10   really inconsistent with the letter.  I mean, the letter says
11   that he accepted responsibility for the pregnancy.  It doesn't
12   say when he did that.  The respondent's mother has testified that
13   after the respondent was born, that, basically, the grandmother
14   said this is your son, and, essentially, the respondent's father,
15   sort of begrudgingly accepted it.  That is, you know, that is
16   consistent with this letter.  It doesn't say I accepted
17   responsibility for the pregnancy while she was pregnant.  It just
18   says I accepted responsibility for it, which could, which could
19   be done at any time.  And, then, in terms of paragraph, saying
20   our friendship terminated soon after the birth, the respondent's
21   mother never testified that during the pregnancy the friendship
22   was terminated.  It just said that they stayed apart.  So, I
23   would say that this paragraph also is not, you know --
24   JUDGE TO MR. CONLIN

25        But, doesn't it indicate that they had a relationship until

A 40 396 827                    33                    March 8, 2006

42

1   after the child was born?

2   MR. CONLIN TO JUDGE

3       Well, well, I mean, it says our friendship terminated.  It

4   doesn't necessarily go into the details of what the friendship

5   was during the pregnancy.  I mean, I would, it, I mean, it's

6   possible for you to, you know, for you to consider yourself

7   friends with someone, but, not see them for a while.  I mean, I

8   have plenty of friends that I don't see, you know, for months at

9   a time.

10  JUDGE TO MR. CONLIN

11      Yes, but, she said that he spurned her, completely spurned

12  her.  I mean, you know, the respondent's mother said that --

13  MR. CONLIN TO JUDGE

14      Yes.

15  JUDGE TO MR. CONLIN

16      -- spurned her.

17  MR. CONLIN TO JUDGE

18      Yes.

19  JUDGE TO MR. CONLIN

20      Which --

21  MR. CONLIN TO JUDGE

22      But --

23  JUDGE TO MR. CONLIN

24      -- it doesn't seem to be friendship, but, I, I --

25  MR. CONLIN TO JUDGE

A 40 396 827                    34                  March 8, 2006

43

1      Well, I mean, but, you could have a fight with a friend and

2    spurn them --

3    JUDGE TO MR. CONLIN

4      Okay.

5    MR. CONLIN TO JUDGE

6      -- and you still consider yourself a friend with them.

7    JUDGE TO MR. CONLIN

8      All right.

9    MR. CONLIN TO JUDGE

10     So, I mean, I would say that, you know, reading this against

11   the testimony of the respondent's mother, it's certainly

12   possible.  But, I would say that it's not inconsistent with her

13   testimony.  And, I would say that --

14   JUDGE TO MR. CONLIN

15     But, I guess --

16   MR. CONLIN TO JUDGE

17     -- you know --

18   JUDGE TO MR. CONLIN

19     -- here's my question again.  And, I, and, I'm still

20   troubled by this is, I, I don't really know what the law is in

21   Ghana.  Because it, it's just such a, because, I mean, here I get

22   one statement here in this law review article.  It says, in

23   Ghana, it may be said that legitimacy is secured by the

24   acknowledgment of paternity.  And, that's it.  And, you're saying

25   that, well, it, you know --

A 40 396 827                    35                    March 8, 2006

44

1    MR. CONLIN TO JUDGE

2         Well, I'm --

3    JUDGE TO MR. CONLIN

4         You're saying the acknowledgment of paternity means

5    something different, depending on --

6    MR. CONLIN TO JUDGE

7         Well, I'm saying acknowledgment of paternity is more than

8    just the father saying this is my son.  Acknowledgment of

9    paternity, based on the Court decisions and, is caring for the

10   mother during the pregnancy, and naming the child in accordance

11   with the rituals of the tribe.  That those are what's considered

12   acknowledgment under the law of Ghana.  That it's not just saying

13   this is my son.  That there's, that there's more than that, in

14   terms of the legal definition of acknowledgment, and, I would say

15   that that is consistent with a memorandum from the, you know,

16   from the lawyer of, you know, from the lawyer, and it's also

17   consistent with the Court case Republic v. Mala (phonetic sp.).

18   And, I also would say that that is ultimately what the BIA found

19   was the law in Ghana.  So, I mean, again, I mean, ultimately, I

20   think the BIA is the final authority on this issue, and the BIA

21   said that, you know, they think that this is what the law is.

22   So, I, I, you know, it just seems that the, the parties and the

23   Court are bound by what the BIA said.

24   JUDGE TO MR. CONLIN

25         All right.

A 40 396 827                    36                    March 8, 2006

1    JUDGE TO MR. BINGHAM

2        Mr. Bingham, do you have anything you want to add?

3    MR. BINGHAM TO JUDGE

4        I, I would just say that it's clear that there was

5    acknowledgment, not the negative, that there was no

6    acknowledgment.  And, it is clear there was a relationship on, at

7    least on three official junctures.  One is on the birth

8    certificate.  One is on the baptismal certificate.  And, then,

9    the respondent's mother admits that she obtained the consent of

10   the father on that sworn consent form in support of the visa.

11   JUDGE TO MR. BINGHAM

12       Right.

13   MR. BINGHAM TO JUDGE

14       So, therefore, the burden of proof clearly has not been

15   sustained.

16   JUDGE TO MR. BINGHAM

17       All right, but, that's basically what I said before, and, I,

18   I still, I still believe that, I, you know, regardless of what

19   the Board said, but, you know, that's what the Board said.  I, I,

20   you know --

21   MR. BINGHAM TO JUDGE

22       Well, the admissions today --

23   JUDGE TO MR. BINGHAM

24       Yes.

25   MR. BINGHAM TO JUDGE

A 40 396 827                    37                    March 8, 2006

46

1    -- put her credibility about spurning in even graver doubt.

2    So, I believe that the credibility has, or lack thereof, is

3    clear.

4    JUDGE TO MR. BINGHAM

5        Okay.

6    JUDGE FOR THE RECORD

7        We'll go off the record for the oral decision.

8                    JUDGE RENDERS ORAL DECISION

9    JUDGE TO MR. CONLIN

10       All right, Mr. Conlin, do you want to reserve appeal?

11   MR. CONLIN TO JUDGE

12       Yes, Your Honor.

13   JUDGE TO MR. CONLIN

14       All right.   The appeal will be due by close of business

15   April 7th.

16   JUDGE TO MR. AKRAH

17       Q.   Sir, you, you understand my decision.   You, again, have

18   the right to appeal by decision to the Board of Immigration

19   Appeals, and, I'm sure they'll make a decision one way or the

20   other.   Do you understand that?   In order for your appeal to be

21   considered, the appeal must be received by close of business

22   April 7th.   If the appeal is not received by close of business

23   April 7th, my decision will be final.

24   JUDGE FOR THE RECORD

25       Matter is concluded.

A 40 396 827                  38                  March 8, 2006

47

1                          HEARING CLOSED

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

48