# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | |
|---|---|
| Samuel Ankrah,<br>    Petitioner<br>v.<br>Alberto Gonzales, et al.,<br>    Respondents | No. 3:06cv554 (PCD)<br><br><br>March 27, 2007 |

## PETITIONER'S MEMORANDUM OF LAW

The petitioner Samuel Ankrah hereby submits this memorandum of law in support of his petition for review and petition for a writ of habeas corpus that have been remanded to this Court by the Second Circuit Court of Appeals. The petition for review challenges a final order of removal entered against the petitioner by the Board of Immigration Appeals ("BIA") and the petition for a writ of habeas corpus challenges the petitioner's ongoing detention by the Department of Homeland Security ("DHS").

In the instant proceedings, the petitioner requests an order from the Court mandating his release from custody and cancellation of the removal order entered by the BIA. The petitioner is a U.S. citizen and is thus not subject to removal from the U.S. or detention by the immigration authorities. The petitioner derived U.S. citizenship from his mother under former 8 U.S.C. § 1432(a) when she became a naturalized U.S. citizen. Under former 8 U.S.C. § 1432(a)(3) a child born out of wedlock derived U.S. citizenship upon his mother's naturalization if: 1) the naturalization occurred before the alien's eighteenth birthday; 2) at the time his mother naturalized, the alien resided in the U.S. as a lawful permanent resident;

3) the alien's paternity was not established by legitimation. *See Ashton v. Gonzales*, 431 F.3d 95, 97 (2d Cir. 2005).  Because the petitioner meets all three of the criteria of former 8 U.S.C. § 1432(a)(3), he is a U.S. citizen.

## PROCEDURAL HISTORY

Petitioner Samuel Ankrah is a thirty-one year old native of Ghana. JA[1], 263.  The petitioner immigrated to the U.S. on January 17, 1987 as a lawful permanent resident. JA, 360.  The petitioner's mother became a U.S. citizen through naturalization on February 1, 1991. JA, 246.  At the time the petitioner's mother naturalized, he was fifteen years old. JA, 246, 263.  The petitioner's parents have never been married. JA, 206.

The petitioner was convicted of possession of narcotics under Conn. Gen. Stat. § 21a-279(a) on November 19, 1998 and November 13, 2001. JA, 250, 253.  The petitioner was also convicted of sexual assault in the second degree under Conn. Gen. Stat. § 53a-71 on June 27, 2002. JA, 248.

The petitioner was placed into removal proceedings by DHS through the issuance of a Notice to Appear ("NTA") dated June 17, 2005. JA, 366-369.  In the NTA, DHS alleges that the petitioner is removable from the U.S. on account of his criminal convictions. JA, 366-369.  During his removal proceedings, the petitioner argued that he is not subject to removal because he derived U.S. citizenship from his mother at the time she became a U.S. citizen. JA, 255-256, 277-280.

During his removal proceedings, the sole contested issue regarding the petitioner's claim

---

[1] JA refers to the Joint Appendix that was submitted to the Second Circuit Court of Appeals and constitutes the record in this case.

to U.S. citizenship was whether his paternity had been established by legitimation. JA, 153. Under former 8 U.S.C. § 1432(a)(3), if the petitioner's paternity was not established by legitimation, then he derived U.S. citizenship from his mother. *See Ashton*, 431 F.3d at 97. Conversely, if the petitioner's paternity was established by legitimation, then he did not derive U.S. citizenship from his mother. *See Id.*  In determining whether the petitioner's paternity was established by legitimation, the Court looks to the law of the jurisdiction where he was born – namely Ghana. *See Gorsira v. Loy*, 357 F. Supp. 2d 453, 459 (D. Conn. 2005), *reconsidered on other grounds*, *Gorsira v. Chertoff*, 364 F. Supp. 2d 230 (D. Conn. 2005); *Matter of Rowe*, 23 I&N Dec. 962 (BIA 2006).

During his removal proceedings, the petitioner argued that his paternity was not established by legitimation.  Because there is no precedent decision from the BIA interpreting the scope of Ghanaian legitimation law, the petitioner submitted several pieces of evidence into the record in order to establish the contents of Ghanaian legitimation law. *See Matter of Soleimani*, 20 I&N Dec. 99, 106 (BIA 1989) (a party seeking to rely on foreign law must prove its contents by a preponderance of evidence).

The petitioner submitted a letter from an attorney in Ghana discussing the scope of Ghana's legitimation law. JA, 239-241.  The Ghanaian attorney indicated that there is no specific statutory law of legitimation in Ghana and that the rule concerning the establishment of paternity for children born out of wedlock is set by the common law. JA, 239-241.  The Ghanaian attorney stated that under applicable Ghanaian case law, for children born out of wedlock, paternity is not established by legitimation unless the putative father cared for the mother during her pregnancy and named the child in accordance with his tribe's naming

rituals. JA, 239-241.  The letter citied relevant Ghanaian Supreme Court case law as support its conclusions. JA, 239-241.

The petitioner also made a request to the Library of Congress for a report concerning the law of legitimation in Ghana. JA, 244.  The Library of Congress provided a written response confirming that there is no specific statute concerning the legitimation of children born out of wedlock in Ghana. JA, 284.  The Library of Congress indicated that there are laws in Ghana relating to the registration of births, but that these laws do not set forth the specific requirements of legitimation for children born out of wedlock. JA, 284.  The Library of Congress's response included a copy of excerpts from a law review article from Ghana discussing the laws of marriage and legitimation. JA, 307-313.  The law review article indicates that legitimation is established in Ghana by "acknowledgement" of the child by the father. JA, 313.  The law review article does not indicate what the term "acknowledgement" means under Ghanaian law. JA, 313.

 The petitioner subsequently provided a second letter from the attorney in Ghana that had previously provided a letter to the Court. JA, 315-316.  In this second letter, the Ghanaian attorney gave his opinion regarding the documents provided by the Library of Congress, specifically the law review article that it had provided. JA, 315-316.  The letter stated that the law review article correctly discussed the law of legitimation in Ghana, but that it did not describe what the term "acknowledgement" means under Ghanaian law. JA, 315.  The letter states that "acknowledgement" of a child born out of wedlock is accomplished by the father caring for the mother of the child during her pregnancy and naming the child in accordance with the naming rituals of his tribe after the child is born. JA, 315-316.  Accompanying this second letter, the attorney included copies of the relevant decisions from the Ghanaian

4

Supreme Court previously cited and also a copy of excerpts from a family law treatise in Ghana to support his conclusions. JA, 317-347.

In support of its argument that the petitioner's paternity had been established by legitimation, DHS entered into the record a copy of the package of documents submitted by the petitioner's mother in support of his original application to obtain lawful permanent residence in the U.S – JA, 257-270 – as well as his immigrant visa. JA, 360.  DHS argued that because the name of the petitioner's father is on his birth certificate and the petitioner concedes that his father eventually admitted that he is his son, his paternity had been established by legitimation. JA, 202, 247.

An evidentiary hearing was held concerning the petitioner's claim to U.S. citizenship on July 29, 2005. JA, 200-230.  At the hearing, the petitioner's mother testified that during her pregnancy carrying the petitioner, she lived with her sister, her sister's fiancée, and her brother in their mother's house in Ghana. JA, 207.  The petitioner's mother testified that the petitioner's father lived in a boarding house in a different area of Ghana that is about three hours away driving. JA, 207.

The petitioner's mother testified that after she had been pregnant for three months, she spoke with the petitioner's father and told him that he is, in fact, the petitioner's father. JA, 208.  She stated that the petitioner's father disputed her belief that he was the petitioner's father. JA, 209.  She stated that she had no further contact with the petitioner's father until after giving birth to the petitioner. JA, 210.  She stated that before giving birth, she did speak with the grandmother of the petitioner's father and told her that her grandson is the petitioner's father. JA, 209-210.  The petitioner's father's grandmother stated that she would talk to the petitioner's father first and then get back to her about the pregnancy. JA, 210.  The

petitioner's mother had no further contact with the petitioner's father or his family before giving birth to the petitioner. JA, 210. She testified that the petitioner's father was not around during the pregnancy. JA, 216.

The petitioner's aunt also testified that during the petitioner's mother's pregnancy with the petitioner, she lived with the petitioner's aunt, the aunt's fiancée, and her brother. JA, 227. The petitioner's aunt stated that in order to support the household, she and her fiancée worked and her mother sent over money from the U.S. JA, 227. She testified that the petitioner's mother did not receive any financial support from the petitioner's father. JA, 228.

The petitioner's aunt testified that after the petitioner was born, she went to his father's family and informed that he was born. JA, 228. The aunt testified that her fiancée went to the government registry and registered the petitioner's birth. JA, 228. She stated that because her fiancée knew the name of the petitioner's father, the father's name was listed on the birth certificate. JA, 228.

The petitioner's mother testified that a few days after giving birth to the petitioner, his father's aunt came to see the baby. JA, 210. She testified that about a few days after that meeting, the petitioner's father and his father's mother saw the baby. JA, 211. This meeting took place at the petitioner's father's grandmother's house. JA, 211. The petitioner's mother testified that at this meeting, the petitioner's father's mother held the petitioner and said that he was the son of the petitioner's father. JA, 211. The petitioner was given the family name of his father. JA, 211. Neither during nor after the pregnancy did the petitioner's father provide any financial support for the petitioner's mother. JA, 211. After giving birth to the petitioner, his mother did not have any romantic or social relations with the petitioner's

6

father. JA, 212.  The petitioner's mother and aunt raised the petitioner and paid for his financial expenses until his mother came to the U.S.. JA, 212.

On August 24, 2005, Immigration Judge ("IJ") Michael W. Straus issued an oral decision finding that the petitioner is not a U.S. citizen and ordering his removal to Ghana. JA, 149-157.  The IJ held that the only contested issue regarding the petitioner's citizenship claim is whether his paternity has been established by legitimation in Ghana. JA, 153.  The IJ held that because the petitioner was born abroad, he bears the burden of proving that he is a U.S. citizen by a preponderance of the evidence. JA, 153.  The IJ held that the petitioner had not met his burden of proof in establishing what the law is in Ghana concerning legitimation of children born out of wedlock or facts sufficient to demonstrate that his paternity was not established by legitimation. JA, 154-156.

The IJ held that the law regarding legitimation in Ghana is unclear. JA, 155.  The IJ noted that the submissions from the attorney in Ghana referenced caring for the mother during her pregnancy and naming the child in accordance with custom. JA, 155.  The IJ held that the naming requirement had been met. JA, 155.  The IJ held that it was unclear whether the requirement of caring for the mother during her pregnancy was "black letter law" and it was unclear what that terms means under Ghanaian law. JA, 155.  The IJ held that in light of the fact that the petitioner's father eventually admitted that the petitioner is his son and consented to his immigration to the U.S., he could not find that the petitioner had established by a preponderance of evidence that his paternity was not established by legitimation. JA, 155.

The petitioner filed an appeal of the IJ's decision with the BIA. JA, 140-142.  In a decision dated January 26, 2006, a three-member panel of the BIA granted the petitioner's appeal and remanded his case to the IJ for further proceedings. JA, 119-121.  The BIA held

that the petitioner had met his burden of proof in establishing the manner in which paternity can be established by legitimation for children born out of wedlock in Ghana. JA, 120. The BIA held that the "legal mechanism for legitimation in Ghana" is that the father cares for the mother during her pregnancy and the father names the child in accordance with his tribal naming rituals. JA, 120.

The BIA held that although the petitioner had established what the law of legitimation in Ghana consists of, the only evidence he had submitting regarding whether that law had been satisfied what the testimony of his mother and his aunt. JA, 120. The BIA noted that the testimony of the petitioner's mother and aunt, if it was truthful, indicated that the mechanism for legitimation had not been met for the petitioner because his father neither cared for his mother during the pregnancy nor named him in accordance with his specific tribal rituals. JA, 120. However, the BIA noted the IJ had not made a specific credibility finding regarding the testimony of these witnesses. JA, 120. The BIA remanded the petitioner's case for further proceedings so that the IJ could, in the first instance, make a clear credibility finding regarding the testimony of the petitioner's mother and aunt. JA, 120-121.

During the remanded proceedings, the IJ took a small amount of additional testimony from the petitioner's mother, mainly concerning the consent letter submitted by the petitioner's father to the U.S. embassy relating to his immigration to the U.S. JA, 95-105. During the remanded proceedings, DHS conceded that BIA's remand order was limited and the sole issue before the Court was whether the testimony of the petitioner's mother and aunt was credible. JA, 92.

In an oral decision dated March 8, 2006, IJ Straus again found that the petitioner is not a U.S. citizen and ordered his removal to Ghana. JA, 58-63. The IJ held that despite the BIA's

findings, he was still not convinced that the law regarding legitmation in Ghana was clearly established by the petitioner. JA, 61.  The IJ held that it was unclear what the term "caring for the mother during the pregnancy" means in Ghana. JA, 60.  The IJ also stated that "it is very, very difficult to evaluate these witnesses' credibility." JA, 60.  The IJ noted that the events they were testifying to occurred over thirty years ago. JA, 59-60.  The IJ also stated that the testimony of the petitioner's mother and aunt could be read as being in conflict with the letters submitted by the petitioner's father with his original visa package. JA, 60. The IJ did not make a clear credibility finding regarding the testimony of the petitioner's mother and aunt, but instead simply held that the petitioner had not met his burden of proof in establishing that he is a U.S. citizen. JA, 62-63.

The petitioner filed a timely appeal of the IJ's second decision with the BIA. JA, 48-50. On June 19, 2006 a one-member panel of the BIA consisting of temporary member Brian M. O'Leary dismissed the petitioner's appeal. JA, 32-33.  In this second decision, the temporary member of the BIA held that the law regarding legitimation in Ghana is unclear and that the facts as presented by the petitioner are unclear concerning whether the requirements of legitimation were met. JA, 33.  The temporary BIA member held that although the IJ did not find the petitioner's mother and aunt to be incredible, he failed to affirmatively credit their testimony. JA, 33.  The temporary BIA member held that the petitioner did not meet his burden of proof in establishing the law of legitimation in Ghana or facts sufficient to demonstrate that legitimation had not been established. JA, 33.

The temporary BIA member did not mention the portion of the prior decision rendered by a three-member panel of permanent BIA members finding that the petitioner had met his burden of proof in establishing what the law is in Ghana concerning legitmation. JA, 33.

The temporary BIA member also did not make a clear credibility finding or discuss the fact that the IJ failed to make a clear credibility finding. JA, 33.  The petitioner filed a timely appeal of the BIA's June 19, 2006 decision with the Second Circuit Court of Appeals. Before the Second Circuit, the parties agreed to a joint stipulation to remand his proceedings to this Court under 8 U.S.C. § 1252(b)(5)(B).

In addition to the order of removal, on March 9, 2006 the IJ found that the petitioner was not eligible for release from custody as he is subject to mandatory detention under 8 U.S.C. § 1226(c) as an alien convicted of an aggravated felony.  The petitioner filed an appeal of the IJ's decision with the BIA on April 7, 2006.  On June 8, 2006, the BIA dismissed the petitioner's appeal of the IJ's decision in bond proceedings through the issuance of a summary affirmance without opinion under 8 C.F.R. § 1003.1(e)(4).

On April 10, 2006 the petitioner filed a habeas corpus petition with the District Court challenging his continued detention by the immigration authorities.  The petitioner raised two challenges to his detention.  First, the petitioner argued that because he is a U.S. citizen, the immigration authorities have no jurisdiction to detain him because Congress has only granted them the right to detain aliens. *See* 8 U.S.C. § 1226.  Second, the petitioner argued that regardless of whether he is a U.S. citizen or an alien, it violated his due process rights to be detained for over one-year during removal proceedings without being given the right to a bond hearing.

In a decision rendered on August 29, 2006, the Court transferred in part and denied in part the petitioner's habeas petition.  The Court found that under 8 U.S.C. § 1252(b)(5), only a circuit court of appeals possesses jurisdiction to adjudicate a citizenship claim, therefore it could not adjudicate his claim to citizenship in the context of his habeas petition.  The Court

thus transferred the habeas petition as it relates to the petitioner's claim to U.S. citizenship to the Second Circuit.  The Court denied the portion of the petitioner's habeas claim as it relates solely to the length of his detention, finding that detention of one-year was reasonable given the fact that his immigration proceedings included two separate appeals to the BIA.

The portion of the habeas corpus petition that was transferred to the Second Circuit was remanded back to this Court along with the petition for review challenging the petitioner's removal order pursuant to a stipulation of the parties.

## ARGUMENT

## I.   STATUTORY FRAMEWORK REGARDING THE PETITIONER'S CLAIM TO DERIVATIVE CITIZENSHIP.

The outcome of both the petition for review and the petition for a writ of habeas corpus that were remanded to this Court by the Second Circuit hinge on whether the petitioner derived U.S. citizenship from his mother.  If the petitioner derived U.S. citizenship from his mother, he cannot be lawfully detained by the immigration authorities[2] and is not subject to removal from the U.S.  If the petitioner did not derive U.S. citizenship from his mother, then he can be lawfully detained by the immigration authorities (at least for a reasonable time period) and he is subject to removal.

The Second Circuit has held that in determining whether an individual has derived U.S. citizenship from his parents or parent, it will apply the law applicable at the time the relevant events (e.g. naturalization of the parent, child's eighteenth birthday) occurred.  *See e.g.*

_____

[2] In *Demore v. Kim*, 538 U.S. 510, 514 n.3 (2003) the Supreme Court stated the obvious – namely that if an individual in removal proceedings demonstrates that he is a U.S. citizen, he is not subject to detention under the immigration laws.

11

*Langhorne v. Ashcroft*, 377 F.3d 175, 178-179 (2d Cir. 2004).  The Second Circuit has held that the generous derivative naturalization rules created by the Child Citizenship Act of 2000 ("CCA") are not retroactive and are not applicable if any of the relevant events regarding derivative citizenship occurred before it was passed. *See Drakes v. Ashcroft*, 323 F.3d 189, 191 (2d Cir. 2003).  Because all of the relevant events in the case at bar occurred before the CCA was passed, the Court should look to the law that existed before it was passed. *See Langhorne*, 377 F.3d at 178-179.

The Second Circuit has held that under the law that existed prior to the CCA,

> a non-citizen child[], who was born out of wedlock and whose paternity has not been legally established, becomes a U.S. citizen upon his mother's naturalization provided (1) the mother is naturalized while the child is under 18 years old and (2) the child 'it residing in the United States pursuant to a lawful admission for permanent residence at the time of the [mother's] naturalization…or thereafter begins to reside permanently in the United States while under the age of eighteen years." 8 U.S.C. § 1432(a)(5).

*Ashton v. Gonzales*, 431 F.3d 95, 97 (2d Cir. 2005).  Judge Underhill has held that, "To determine if an individual qualifies for derivative citizenship under [former] 8 U.S.C. § 1432(a)(2), the court considers whether paternity has been established by legitimation under the laws of the child's native country." *Gorsira v. Loy*, 357 F. Supp. 2d 453, 459 (D. Conn. 2005), *reconsidered on other grounds*, *Gorsira v. Chertoff*, 364 F. Supp. 2d 230 (D. Conn. 2005).  The BIA has adopted Judge Underhill's approach. *See Matter of Rowe*, 23 I&N Dec. 962 (BIA 2006) (specifically adopting the District Court's position in *Gorsira*).

It is undisputed that the petitioner's parents have never been married, that his father has never become a U.S. citizen, that he entered the U.S. as a lawful permanent resident before he turned eighteen, that he was living in the U.S. pursuant to that lawful permanent residence when his mother was naturalized, and that his mother naturalized before he turned eighteen.

JA, 119-120, 152-153.  The only disputed issue regarding the petitioner's citizenship claim is whether his paternity was established by legitimation. JA, 119-120, 152-153.  Because the petitioner was born in Ghana, the Court looks to the laws regarding legitimation in Ghana, not the U.S. *See Gorsira*, 357 F. Supp.2d at 459.

## II.     STANDARD OF REVIEW.

This Court should review the petitioner's claim to U.S. citizenship *de novo*.  Although 8 U.S.C. § 1252(b)(5)(B) does not specifically address the standard of review to be used by a District Court in adjudicating a claim of derivative citizenship, the Third Circuit has found that the standard of review is *de novo*. *See Joseph v. Att'y General*, 421 F.3d 224, 231-232 (3rd Cir. 2005).  The Third Circuit's reading of the statute stems from the decision of the Supreme Court in *Agosto v. INS*, 436 U.S. 748 (1978).  In *Agosto*, the Supreme Court interpreted the predecessor to 8 U.S.C. § 1252(b)(5)(B) and found that it required *de novo* review of a *prima facia* valid claim to U.S. citizenship in the District Court.  *Agosto*, 436 U.S. at 768.  The Supreme Court also noted that its prior decision in *Ng Fung Ho v. White*, 259 U.S. 276 (1922) mandated that a person with a valid claim to U.S. citizenship is entitled to *de novo* review of their claim in the District Court.

## III.    THE BIA'S FIRST DECISION WAS CORRECT IN HOLDING THAT THE PETITONER MET HIS BURDEN OF PROOF IN ESTABLISHING THE CONTENTS OF GHANAIAN LEGITIMATION LAW.

As stated earlier, the sole contested issue regarding the petitioner's claim to U.S. citizenship is whether his paternity has been established by legitimation in Ghana.  In determining whether the petitioner's paternity was established by legitimation in Ghana, there are two relevant issues: first, what is the law in Ghana concerning legitmation, and

second, does the petitioner meet the criteria set forth in the law concerning legitimation.  The BIA held in the case at bar, relying on prior precedent decisions, that the contents of foreign law is a matter of fact and that the party seeking to rely on foreign law must prove the contents of that law by a preponderance of the evidence. JA, 2; *citing Matter of Soleimani*, 20 I&N Dec. 99, 106 (BIA 1989); *Matter of Annang*, 14 I&N Dec. 502, 503 (BIA 1973).  The petitioner takes no issue with the BIA's placement of the burden of proof in regards to foreign law.

The petitioner argued to the BIA that the law of legitimation in Ghana is set by common law precedent and that in order for a child born out of wedlock to be legitimated, the father must have both cared for the mother during the pregnancy of the child and named the child in accordance with the naming rituals of his tribe. JA, 131-133.  In support of his arguments regarding the contents of Ghanaian legitimation law, the petitioner submitted two letters from a private attorney in Ghana as well as copies of Ghanaian Supreme Court decisions, exceprts from a Ghanaian family law treatise, and a report from the Library of Congress. JA, 239-241, 244, 281-348.  The petitioner also submitted documents from the Foreign Affiars Manual in which the State Department acknowledges that simply having the father's name on a child's birth certificate is not proof of legitimation, as well as a copy of a precedent decision from the BIA drawing a similar conclusion. JA, 271-276.

In its first decision on the merits of his challenge to the IJ's removal order, the BIA – in the form of a three member panel composed of permanent members – found that the petitioner had met his burden of proof in establishing the contents of the law of legitimation in Ghana. JA, 120.  The BIA held that in order for a child born out of wedlock in Ghana to be legitimated, the father must have cared for the mother during her pregnancy and he must also

14

name the child in accordance with his tribal rituals. JA, 120.  In its second decision, the BIA cast doubt on the propriety of this portion of its first decision without explicitly overruling it. JA, 33.

To the extent that the BIA's  second decision finds that the petitioner did not meet his burden of proof in establishing the contents of Ghanaian legitimation law, it violated the "law of the case" doctrine because it overrules a holding made in its prior decision without giving any clear reason why the prior ruling was being overturned.  In fact, the second BIA decision – which was written by a one-member panel composed of a temporary member – seems completely oblivious to the fact the first decision already ruled on the petitioner's arguments concerning the contents of Ghanian legitimation law.  In describing the "law of the case" doctrine, the Second Circuit has stated that it, "provides that [an adjudicative body] will 'usually adhere to its own decision at an earlier stage of the litigation.'" *Chan v. Gantner*, 464 F.3d 289, 295 n.3 (2d Cir. 2006) (quoting *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir.2000)) (internal quotation omitted)).

The Supreme Court has held that the "law of the case" doctrine, "promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settles issues.'" *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 816 (1988) (internal quotation omitted).  The Second Circuit has stated that "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again."  *Virgin Atlantic Airways, Ltd. v. National Mediation Board*, 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964)).  The Second Circuit has stated that there are limited circumstances where the "law of the case" need not be strictly followed, such as when there is, "an intervening change of

15

controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Id*. (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478 at 790.)

The petitioner was unable to find a precedent decision from the Second Circuit specifically holding that the "law of the case" doctrine applies in the context of removal proceedings.  However, the Second Circuit has stated that, "While the [BIA] is free to modify its precedents in a reasoned fashion, it acts arbitrarily and unlawfully when it simply ignores established holdings." *Johnson v. Ashcroft*, 378 F.3d 164, 171 (2d Cir. 2004).  The petitioner submits that the "law of the case" doctrine is consistent with the above quoted portion of *Johnson* – namely that once the BIA makes a decision regarding a particular issue, it cannot deviate from that substantive holding without the existence of new evidence or a reasoned explanation concerning why it deviated from the original decision.

The immigration court has promulgated an internal policy memorandum indicating that it will apply the "law of the case" doctrine in the context of removal proceedings. *See* OPPM 0-02, Changes of Venue, Creppy, Chief IJ (Oct. 9, 2001), *reprinted in* 79 No. 3 *Interpreter Releases* 66, 84-88 (Jan. 14, 2002).  That policy memorandum was specifically written to give guidance to IJs in cases which had been the subject of a change of venue. *Id*. at 84-85. The policy memorandum specifically states that, "the law of the case doctrine, as stated in this section, shall apply in COV circumstances." *Id*. at 86.  Obviously if the "law of the case" doctrine applies when venue has been changed from one IJ to the next, it certainly applies when the same IJ, or the same BIA, rules for a second time in a case.  In addition, the Seventh Circuit has explicitly held that the "law of the case" doctrine applies in the context of removal proceedings. *See Zhang v. Gonzales*, 434 F.3d 993, 997-998 (7th Cir. 2006).

The petitioner submits that the "law of the case" doctrine should be applied in the context of administrative removal proceedings.  Under the "law of the case" doctrine, the BIA clearly erred in ignoring the substance of its first decision on the issue of Ghanaian legitimation law in adjudicating the petitioner's case.  The BIA presented no reason why the substance of its holding regarding the law of legitimation in Ghana in its first decision should be reconsidered or overturned.

Based on the record, the petitioner has met his burden of proof in establishing the contents of Ghanaian legitimation law.  The petitioner presented sufficient evidence – including two letters from a private attorney in Ghana, two decisions from the Ghanaian Supreme Court, copies of a Ghanaian family law treatise, and copies of the Foreign Affairs Manual – to demonstrate that in order for a child born out of wedlock in Ghana to be considered legitimate, his father must have cared for his mother during her pregnancy and also named the child in accordance with his tribe's naming rituals.  The petitioner's case was pending before EOIR for nearly one-year and the government did not submit any evidence to contradict that presented by the petitioner.

**IV.    THE BIA ERRED IN FINDING THAT THE TESTIMONY OF THE PETITIONER'S MOTHER AND AUNT WAS INSUFFICIENT TO ESTABLISH FACTS DEMONSTRATING THAT HE HAS NOT BEEN LEGITIMATED UNDER GHANAIAN LAW.**

Having established the contents of Ghana's legitimation law, the petitioner must then demonstrate that the mechanism for legitimation – i.e. that his father cared for his mother and named in accordance with his tribal rituals – was not met.  In order to meet his burden of proof in this regard, the petitioner introduced the testimony of his mother and aunt.  JA, 205-229.  They both testified that the petitioner's father did not care for his mother during her

pregnancy and that although the petitioner was given his father's last name, he was not named in accordance with any tribal rituals. JA, 205-229.

In its first decision, the BIA noted that the only evidence in the record presented by the petitioner to establish that the requirements of legitimation were not met was the testimony of his mother and aunt. JA, 120.  The BIA also noted that the IJ did not make a clear finding regarding the credibility of these witnesses' testimony. JA, 120.  The BIA held that because it is an appellate body that generally reviews an IJ's credibility determination for error, it ordered a remand of the petitioner's case so that the IJ could make a clear credibility finding in the first instance. JA, 120.

On remand, the IJ refused to make an explicit credibility finding. JA, 59-63.  The IJ held that the testimony of the petitioner's mother and aunt could be read against letters from the petitioner's father in the record, but he did not do so. JA, 60.  The IJ simply held that the petitioner did not meet his burden of proof in establishing a claim to derivative citizenship without making a clear credibility finding regarding the testimony of his mother and aunt. JA, 59-63.

In its second decision, the BIA also did not make a clear credibility finding. JA, 33. Specifically, the BIA stated, "While the Immigration Judge did not treat the respondent's mother and aunt as liars, we understand his decision as not affirmatively crediting their account in light of the limited evidence of Ghanaian law as it relates to legitimation and in the face of contradictory evidence noted by the Immigration Judge." JA, 33.  The BIA held that the IJ "reasonably concluded" that the petitioner had not met his burden of proof in establishing a citizenship claim. JA, 33.

The petitioner submits that the portion of BIA's most recent decision discussing the credibility of the testimony of his mother and aunt is deficient in at least two regards.  First, the BIA's decision erroneously fails to make a clear finding regarding the credibility of the testimony of the petitioner's mother and aunt.  Because their testimony the only evidence available to the petitioner regarding the contested issues in this case, he is entitled to a clear finding regarding whether their testimony is credible.

Second, the BIA clearly erred in finding that the "limited evidence of Ghanaian law as it relates to legitimation" has a bearing on the credibility of the testimony of the petitioner's mother and aunt.  The petitioner's mother and aunt testified regarding the relationship of the petitioner's mother to his father before, during, and after the pregnancy and how the petitioner was given his name. JA, 205-229.  The petitioner's mother and aunt are not lawyers and did not provide any testimony regarding the contents of Ghanaian legitimation law.  The clarity, or ambiguity, of Ghanaian legitimation law has no relationship with the credibility of the testimony of the petitioner's mother and aunt.  Thus no rational trier of fact could "not affirmatively credit[] their account in light of the limited evidence of Ghanaian law as it relates to legitimation" and this portion of the BIA's decision cannot stand. JA, 33.

The petitioner was unable to find any specific case from the Second Circuit dealing with the issue of how to judge the credibility of witnesses in the context of a claim to derivative citizenship.  However, the Second Circuit has a highly developed body of case law concerning the issue of credibility of witnesses in the context of asylum law.  The petitioner submits that this body of law should be used in determining whether the testimony of his mother and aunt is credible.  The petitioner submits that under this body of case law, the testimony of his mother and aunt should be found credible.  As was acknowledged by the

BIA in its first decision, if the testimony of the petitioner's mother and aunt is credible, then

he has met his burden of proof in establishing his claim to derivative citizenship.

### A. The BIA erred in failing to make a clear credibility finding regarding the testimony of the petitioner's mother and aunt.

The petitioner was unable to find a specific case from the Second Circuit regarding how

it will review a credibility determination in the context of a claim for derivative citizenship.

However, it routinely reviews credibility determinations of the BIA in the context of the

denial of an asylum application. *See e.g. Secaida-Rosales v. INS*, 331 F.3d 297 (2d Cir.

2003); *Qiu v. Ashcroft*, 329 F.3d 140 (2d Cir. 2003); *Ramsameachire v. Ashcroft*, 357 F.,3d

169 (2d Cir. 2004); *Pang v. Bureau of Citizenship and Immigration Services*, 448 F.3d 102

(2d Cir. 2006).

The Second Circuit has noted that in the context of an asylum claim, credible testimony is

often all that an applicant can present in support of his claim for relief from deportation. *See*

*e.g. Abankwah v. Ashcroft*, 185 F.3d 18, 24-25 (2d Cir. 1999). The Court has held that if an IJ

or the BIA denies an asylum application, the applicant is entitled to a clear finding regarding

the credibility of testimony given in support of his application. *See Diallo v. INS*, 232 F.3d

279, 287 (2d Cir. 2000).  The Second Circuit has held that the BIA errs when it fails to make

a clear finding regarding the credibility of witnesses in support of an asylum claim. *Id*. at

287, 290.

The Second Circuit has also held that, "An adverse credibility finding must be based on

specific, clear reasons with a legitimate nexus to the finding."  *Pang*, 448 F.3d at 107; *see*

*also Lin v. Gonzales*, 445 F.3d 127, 132 (2d Cir. 2006) ("An adverse credibility

determination must be based on 'specific, cogent reasons' that 'bear a legitimate nexus' to

the finding.") (quoting *Secaida-Rosales v. INS*, 331 F.3d 297, 307 (2d Cir. 2003)).  If the BIA makes a negative credibility finding based on minor, isolated, or peripheral inconsistencies in the testimony of the witness, it will not be upheld on review. *Id.*  In addition, "Adverse credibility findings are improper and may be overturned when they are based on speculation, conjecture, or flawed reasoning." *Id*.

The petitioner submits that the Second Circuit jurisprudence regarding the credibility of witnesses in the asylum context should be applied in the case at bar.  The petitioner would note that, similar to many asylum claims, the only evidence available to him regarding the relevant issues in the case at bar is the testimony of his mother and his aunt.  Thus the credibility of those two witnesses will decide whether his citizenship claim is accepted or denied.  The petitioner submits that if an asylum applicant is entitled to a clear finding regarding the credibility of witnesses testifying in support of his application, surely he is entitled to a clear credibility finding.

As the petitioner's counsel pointed out to the IJ and BIA, throughout his proceedings, the credibility of the testimony of the petitioner's mother and aunt was clearly at issue as it was the only evidence presented by the petitioner to meet his burden of proof in establishing that the elements of Ghanaian legitimation law had not been met. JA, 41, 81.  As the petitioner's counsel pointed out, neither DHS nor the IJ raised any concerns with the credibility of the petitioner's mother and aunt during the initial proceedings. JA, 41, 81.

In the remanded proceedings, the IJ stated that he could not make a credibility determination because the events being testified to occurred over thirty years ago. JA, 59-60. The IJ also stated that it was possible to find that the testimony of the petitioner's mother and aunt was in conflict with a letter on the record from the petitioner's father that had been

submitted with the petitioner's original visa package. JA, 60.  However, the IJ did not find

that the testimony of the petitioner's mother and aunt was in conflict with the letter from the

petitioner's father or that their testimony was incredible. JA, 60.   Instead, the IJ just stated

that the testimony was not sufficient to meet the petitioner's burden of proof. JA, 60.

The BIA's second decision does nothing to clear up the serious ambiguity left by the IJ's

decision as it also fails to make a clear credibility finding. JA, 33.  All that the BIA states is

that the IJ was "unable to make a reasonably certain determination as to whether the

[petitioner's] mother and aunt were telling the truth…" JA, 33.  The petitioner submits that

this reason for the IJ's failure to make a clear credibility finding is unacceptable.  Certainly,

the Court would not let an IJ deny an asylum application by stating that he was not able to

"make a reasonably certain determination" about the applicant's credibility.  The petitioner

admits that making a credibility determination in the case at bar is at least somewhat difficult

because of the factors identified by the IJ, however, it is his job to make credibility

determinations.  IJs and the BIA make credibility determinations in "hard cases" all of the

time.  A judge cannot refuse to perform his duties just because he is presented with a difficult

case.  The IJ and BIAs failure to make a clear credibility determination was error.  The Court

should find that the testimony of the petitioner's mother and aunt is credible.

### B. The BIA erred in finding that the clarity, or ambiguity, of Ghanaian law regarding legitimation has a bearing on the credibility of the petitioner's mother and aunt.

The petitioner also submits that the portion of the BIA's decision stating that "we

understand [the IJs] decision as not affirmatively crediting [the testimony of the petitioner's

mother and aunt] in light of the limited evidence of Ghanaian law as it relates to legitimation

and in the face of contradictory evidence noted by the Immigration Judge" is clearly

erroneous. Although this is not a negative credibility finding, it is at least a finding that the testimony of the petitioner's mother and aunt is not affirmatively credited – which is at least somewhat related to a negative credibility finding. The Second Circuit has held that an IJ or the BIA can only make a negative credibility finding "based on specific, clear reasons with a legitimate nexus to the finding." *Pang*, 448 F.3d at 107. The petitioner is baffled as to how the clarity, or lack thereof, of Ghanaian legitimation law has any bearing on the credibility of his mother and aunt's testimony.

The testimony of the petitioner's mother and aunt was presented to demonstrate that the petitioner's father did not care for his mother during the pregnancy and that he was not named in accordance with the naming rituals of his tribe. JA, 201-204 (discussing by petitioner's counsel, DHS counsel, and the IJ concerning the purpose of the testimony of the petitioner's mother and aunt), 277-280 (brief submitted to the IJ). The petitioner's mother and aunt are not lawyers and did not provide any testimony concerning the contents of Ghanaian legitimation law. JA, 205-229.

The clarity, or lack thereof, of Ghanaian legitimation law has no legitimate nexus to a finding that the testimony of the petitioner's mother and aunt should not be credited. Again, their testimony had absolutely nothing to do with the state of Ghanaian legitimation law  – it had to do with the relationship between the petitioner's mother and father before, during, and after the pregnancy and how the petitioner was named. JA, 203-229. The BIA's decision in this regard cannot withstand scrutiny.

**C. The Court should find that the testimony of the petitioner's mother and aunt is credible and sufficient to meet the petitioner's burden of proof.**

The petitioner submits that, based on the record, the Court should find that the testimony of his mother and aunt is credible and also that it is sufficient to meet his burden of proof in establishing that the legal mechanism for legitimation in Ghana was not met in this case.  As was pointed out by counsel, the issue of the credibility of the petitioner's mother and aunt has been central to his claim from its inception. JA, 41, 81.  Both the IJ and the BIA gave two separate decisions in the case at bar and neither identified any internal inconsistency, obvious implausibility, or other hallmark of incredibility in their testimony.  DHS was given an opportunity to cross-examine both witnesses.  DHS never argued that the testimony of the petitioner's mother and/or aunt was incredible.

The only negative factors pointed to by the IJ were – the fact that the events testified to occurred many years ago, the fact that the petitioner's mother and aunt have an interest in the case at bar, the fact that there are letters in the record from the petitioner's father that could potentially be read against the testimony of his mother. JA, 66-69.  The petitioner submits that none of these factors are sufficient to lead to a finding of incredibility.  In fact, neither the IJ nor the BIA ever made a finding of incredibility.  In light of the history of decisions in this case, surely if there was sufficient evidence in the record to make a finding of incredibility the IJ or BIA would have done so.

Moreover, the first two factors identified by the IJ – passage of time and interest in the case – are insufficient to make a finding of incredibility.  As the petitioner pointed out to the IJ, judges make credibility determinations every day in which witnesses testify in cases that they have a direct interest in and in which some of the relevant events occurred many years

24

ago.  If a judge was permitted to find a witness incredible simply because of one of these factors was present, then most witnesses – e.g. asylum applicants, criminal defendants, victims of crime, civil plaintiffs, civil defendants etc. – would, of necessity, be incredible.

In addition, as the petitioner argued to the IJ and BIA, the testimony of the petitioner's mother and aunt is not inconsistent with the letter from his father in any material respect. The letter from the petitioner's father makes no mention of caring for the petitioner's mother during her pregnancy and makes no mention of any tribal naming ritual. JA, 270.  The manner in which the IJ found that the letter could be found to contradict the petitioner's mother's testimony is the fact that the petitioner's mother testified that right after she found out she was pregnant, the petitioner's father refused to accept responsibility for the pregnancy and she stopped having regular contact with the petitioner's father, yet the letter from the father indicates that he did acknowledge that he is the father and their friendship did not terminate until "soon after the birth" of the petitioner. JA, 98-99, 270.

However, as counsel argued to the IJ, the letter from the father does not indicate when he acknowledged that the petitioner is his son. JA, 270.  The petitioner's mother testified that initially the petitioner's father refused to acknowledge that the petitioner is his son, but that the petitioner's grandmother (his father's mother) acknowledged that he is the petitioner's father after the petitioner was born. JA, 100-101.  It is clear that the acknowledgement from the petitioner's father did not come until after the birth and after the petitioner's grandmother forced him to acknowledge that he is the petitioner's father.  Because the letter from the petitioner's father does not include any timeline regarding this issue, it is not inconsistent with the testimony of the petitioner's mother and aunt.

Moreover, the portion of the letter discussing the petitioner's father's friendship with his mother is not inconsistent with the testimony of the petitioner's mother.  Although the letter indicates that the "friendship" between the petitioner's mother and father did not terminate until after the pregnancy, it does not discuss what he means by the term "friendship." JA, 270.  The petitioner's mother stated during her testimony that before the birth, although they did not stay in contact, there was no specific breaking off of their friendship. JA, 101.  As counsel pointed out to the IJ, many people have people they consider "friends" yet they are on bad terms with and/or do not speak with for quite some time. JA, 107.  Again, there is nothing in the letter that contradicts the testimony of the petitioner's mother and aunt.

In sum, the testimony of the petitioner's mother and aunt in the case at bar was credible.  The testimony establishes that the legal mechanism for the establishment of paternity for a child born out of wedlock in Ghana was not met in the case at bar.  Because the petitioner's paternity was not established by legitimation, he is a U.S. citizen.

## CONCLUSION

The petitioner presented more than sufficient evidence to establish the contents of Ghana's law of legitimation.  The petitioner established that the paternity of a child born out of wedlock is only established if the father cares for the mother during her pregnancy and names the child in accordance with his tribal naming rituals.  With the testimony of his mother and aunt, the petitioner established that neither of these events occurred.  Therefore, he is a U.S. citizen.  The Court should terminate the petitioner's removal order and also order his immediate release from custody.  U.S. immigration laws only allow for the detention of aliens and the petitioner is not an alien, but a U.S. citizen.

Respectfully submitted for Samuel Ankrah by,


/s/
Justin Conlon
federal bar ct26187
Law Offices of Michael Boyle
250 State Street, Unit C2
P.O. Box 335
North Haven, CT 06473
203 239-2299, fax 203 985-8207
jconlon@immigrantcenter.com


## CERTIFICATE OF SERVICE


This is to certify that a copy of the foregoing has been served via the Court's electronic filing system, on March 27, 2007 to AUSA John Hughes, U.S. Attorney's Office, 1576 Church Street, New Haven, CT 06510.



/s/
Justin Conlon