**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SAMUEL ANKRAH, | : | |
| Petitioner, | : | |
| | : | |
| v. | : | Civil No. 3:06CV0554 (PCD) |
| | : | |
| ALBERTO GONZALES, ATTORNEY | : | |
| GENERAL OF THE UNITED STATES; | : | |
| MICHAEL GARCIA, ICE ASSISTANT | : | |
| SECRETARY; STEVEN J. | : | |
| FARQUHARSON, DISTRICT DIRECTOR | : | |
| BUREAU OF IMMIGRATION AND | : | |
| CUSTOMS ENFORCEMENT; and | : | |
| GEORGE SULLIVAN, OFFICER IN | : | |
| CHARGE, DETENTION AND | : | |
| REMOVAL OPERATIONS. | : | |

## RULING ON PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Samuel Ankrah has filed a petition for review challenging a final order of

removal entered against him by the Board of Immigration Appeals ("BIA") and a petition for a

writ of habeas corpus challenging his ongoing detention by the Department of Homeland

Security ("DHS").  Petitioner Ankrah principally claims that he has derived United States

citizenship and is therefore not removable.  By stipulation of the parties, the Second Circuit

transferred this matter back to this Court to consider Petitioner's claim of United States

Citizenship on January 13, 2006.  For the reasons that follow, the Court concludes that Mr.

Ankrah has derived U.S. citizenship and **grants** his Petition for Writ of Habeas Corpus [Doc. No.

1].

## I.     FACTUAL AND PROCEDURAL HISTORY

Petitioner Samuel Ankrah is a 31-year old native of Ghana.  (JA[1] at 365.)  Mr. Ankrah's

_____

[1]  "JA" refers to the Joint Appendix that was submitted to the Second Circuit Court of Appeals
and constitutes the record in this case.

birth certificate lists his mother as Stella Enyonam Abigail Folli and his father as Peter Patrick Kpakpo Ankrah, both of Ghana.  (Id. at 263.)  Mr. Ankrah's parents have never been married. (Id. at 206.)  On January 17, 1987, Mr. Ankrah immigrated to the United States as a lawful permanent resident.  (Id. at 360.)  On February 1, 1991, when Mr. Ankrah was fifteen years old, his mother was naturalized as a United States citizen.  (Id. at 246, 263.)

Petitioner was convicted of possession of narcotics under Connecticut General Statute § 21a-279(a) on November 19, 1998, and again on November 13, 2001.  (JA at 250, 253.)  On June 27, 2002, Petitioner was also convicted of sexual assault in the second degree under Connecticut General Statute § 53a-71.  (Id. at 248.)  Petitioner was placed in removal proceedings by DHS through the issuance of a Notice to Appear ("NTA") dated June 17, 2005.  (Id. at 366-69.)  In the NTA, DHS alleges that Mr. Ankrah is removable from the United States on account of his criminal convictions.  (Id.)  During removal hearings in July and August of 2005, Petitioner argued that he is not subject to removal because he derived United States citizenship from his mother at the time she became a United States citizen.  (Id. at 255-56, 277-80.)

The sole contested issue regarding Petitioner's claim to U.S. citizenship was whether his paternity had been established by legitimation.  (Id. at 153.)  Under former 8 U.S.C. § 1432(a)(3), the petitioner derived U.S. citizenship from his mother if his paternity was not established by legitimation.  See Ashton v. Gonzales, 431 F.3d 95, 97 (2d Cir. 2005).  In determining whether a petitioner's paternity was established by legitimation, the Court looks to the law of the jurisdiction where he was born, in this case Ghana.  Gosira v. Loy, 357 F. Supp. 2d 453, 459 (D. Conn. 2005), reconsidered on other grounds, Gosira v. Chertoff, 364 F. Supp. 2d 230 (D. Conn. 2005); Matter of Rowe, 23 I&N Dec. 962 (BIA 2006).

-2-

During his removal proceedings, Petitioner Ankrah argued that his paternity was not established by legitimation. Because there is no precedent decision from the BIA interpreting the scope of Ghanaian legitimation law, the petitioner submitted several pieces of evidence into the record to establish the contents of Ghanaian legitimation law. First, Petitioner submitted a letter from an attorney in Ghana discussing the scope of Ghana's legitimation law. (JA at 239-41.) The attorney indicated that no specific statutory law of legitimation exists in Ghana and that the rule concerning the establishment of paternity for children born out of wedlock is set by the common law. (Id.) According to the Ghanaian attorney, under applicable Ghanaian case law, the paternity of a child born out of wedlock is not established by legitimation unless the putative father cared for the mother during her pregnancy and named the child in accordance with the tribe's naming rituals. (Id.) The letter cited relevant Ghanaian Supreme Court case law in support of its conclusions. (Id.)

Petitioner also requested a report concerning the law of legitimation in Ghana from the Library of Congress. (JA at 244.) A foreign law expert at the Library of Congress provided a written response confirming that there is no specific statutory law concerning the legitimation of children born out of wedlock in Ghana. (Id. at 284.) The Library of Congress indicated that certain laws in Ghana relate to the registration of births but that these laws do not set forth the specific requirements of legitimation for children born out of wedlock. (Id.) In its written response to Petitioner, the Library of Congress attached a copy of excerpts from a law review article from Ghana discussing the laws of marriage and legitimation and indicating that legitimation is established in Ghana by "acknowledgment" of the child by the father. (Id. at 307-13.) The law review article does not indicate what the term "acknowledgment" means under

Ghanaian law.  (See id. at 313.)

Petitioner subsequently provided the IJ with a second letter from the attorney in Ghana, containing his opinion regarding the documents provided by the Library of Congress.  (JA at 315-16.)  In this second letter, the attorney stated that the law review article correctly discussed the law of legitimation in Ghana but that it did not describe what the term "acknowledgment" means under Ghanaian law.  (Id. at 315.)  According to the attorney, "acknowledgment" of a child born out of wedlock is accomplished by the father's caring for the mother of the child during her pregnancy and naming the child in accordance with the naming rituals of his tribe after the child is born.  (Id. at 316.)  The attorney also attached to his second letter copies of the relevant decisions of the Ghanaian Supreme Court and a copy of excerpts from a Ghanaian family law treatise to support his conclusions.  (Id. at 317-347.)  To rebut Petitioner's claim that paternity had not been established by legitimation, DHS entered into the record a copy of the package of documents submitted by Petitioner's mother in support of his original application to obtain lawful permanent residence in the United States and a copy of his immigrant visa.  (Id. at 257-70, 360.)  DHS took the position that because the name of Mr. Ankrah's father is on his birth certificate and because Mr. Ankrah concedes that his father eventually admitted that he is his son, his paternity had been established by legitimation.  (Id. at 202, 247.)

An evidentiary hearing concerning Petitioner's claim to U.S. citizenship was held before Immigration Judge ("IJ") Michael W. Straus on July 29, 2005.  (JA at 200-30.)  At the hearing, Petitioner's mother, Stella Owusu,[2] testified about her relationship with Petitioner's father during

---

[2]  Although Petitioner's mother name is listed as Stella Enyonam Abigail Folli in Petitioner's birth certificate, she was married in 1982 to Nana A. Owusu, and she appears to now go by her married name.  (JA at 267; see also id. at 200-30.)

her pregnancy carrying Petitioner.  During the pregnancy, Ms. Owusu lived with her sister, her sister's fiancé, and her brother in their mother's house in Ghana; at that time, Petitioner's father lived in a boarding house in a different area of Ghana three hours away by car.  (Id. at 207.)  Ms. Owusu testified that after she had been pregnant for three months, she spoke with Petitioner's father and told him that he is in fact Petitioner's father.  (Id. at 208.)  According to Ms. Owusu, Petitioner's father questioned her belief that he was the father (id. at 209), and she had no further contact with him until after giving birth.  (Id. at 210.)  At another point in her pregnancy, Ms. Owusu spoke with the grandmother of Petitioner's father and told her that her grandson is Petitioner's father.  (Id. at 209-10.)  Ms. Owusu testified that Petitioner's father's grandmother stated that she would talk to Petitioner's father and then get back to Ms. Owusu about the pregnancy.  (Id. at 210.)  Ms. Owusu had no further contact with Petitioner's father or anyone in his family before giving birth to Mr. Ankrah.  (Id.)  Ms. Owusu testified that Petitioner's father was not around her during her pregnancy.  (Id. at 216.)

Petitioner's aunt, Vivien Darko, also testified at the July 29, 2005 hearing and stated that during Ms. Owusu's pregnancy she lived with Ms. Darko, Ms. Darko's fiancé, and their brother. (JA at 227.)  Ms. Darko stated that to support the household, she and her fiancé worked and her mother sent them money from the United States (id.), but that Ms Owusu did not receive any financial support from Petitioner's father.  (Id. at 228.)  Ms. Darko also testified that after Petitioner was born, she went to his father's family and informed them that Petitioner was born, and her fiancé went to the government registry and registered Petitioner's birth.  (Id.)  According to Ms. Darko's testimony, because her fiancé knew the name of Petitioner's father, the father's name was listed on the birth certificate.  (Id.)

Ms. Owusu testified that Petitioner's father's aunt came to visit a few days after Mr. Ankrah was born. (JA at 210.) A few days later, Petitioner's father and grandmother saw the baby during a visit at Petitioner's father's grandmother's house. (Id. at 211.) According to Ms. Owusu, Petitioner's father's mother held Petitioner at this meeting, said that he was the son of Petitioner's father, and gave Petitioner a family name. (Id.) Ms. Owusu also testified that neither Petitioner's father nor his family provided her with financial support at that meeting or thereafter. (Id.) After giving birth to Petitioner, Ms. Owusu did not have any further romantic or social relations with Petitioner's father. (Id. at 212.) Ms. Owusu testified that she and Ms. Darko raised Mr. Ankrah and paid for his financial expenses until Ms. Owusu came to the United States. (Id.)

On August 24, 2005, IJ Michael W. Straus issued an oral decision in which he found that Mr. Ankrah was subject to removal based upon his convictions, determined that Mr. Ankrah had not derived U.S. citizenship, and ordered his removal to Ghana. (Id. at 149-58.) The IJ held that the only contested issue regarding Petitioner's citizenship claim is whether his paternity had been established by legitimation in Ghana, and because Petitioner was born abroad, he bears the burden of proving that he is a U.S. citizen by a preponderance of the evidence. (Id. at 153.) The IJ concluded that Petitioner had not met his burden of proof in establishing what the law is in Ghana concerning legitimation of children born out of wedlock or in demonstrating facts sufficient to demonstrate that his paternity was not established by legitimation. (Id. at 154-56.) In holding that the law of legitimation in Ghana is unclear, the IJ noted that Petitioner's submission from an attorney in Ghana referenced a father's caring for the mother during her pregnancy and naming the child in accordance with custom. (Id. at 155.) The IJ held that in this

case the naming requirement had been met, but it was unclear whether the requirement of caring

for the mother during her pregnancy was "black letter law" and it was unclear what that term

means under Ghanaian law.  (Id.)  In light of the fact that Petitioner's father eventually admitted

that Mr. Ankrah is his son and consented to his immigration to the U.S., the IJ could not find that

Petitioner had established by a preponderance of evidence that his paternity was not established

by legitimation.  (Id.)

Petitioner appealed the IJ's decision on September 23, 2005.  (JA at 140-42.)  On January

26, 2006, a three-member panel of the BIA granted Petitioner's appeal and remanded the matter

to the IJ for further proceedings.  (Id. at 119-21.)  Concluding that Petitioner had met his burden

of proof in establishing the manner in which paternity can be established by legitimation for

children born out of wedlock in Ghana, the BIA held that the evidence presented by Petitioner

"indicates that a child born out of wedlock in Ghana is legitimated when the father

'acknowledges' paternity."  (Id. at 120.)  "A father acknowledges paternity," the BIA continued,

"by caring for the mother during the pregnancy and 'naming' the child after birth.  The 'naming'

of a child is done through cultural ceremonies unique to each Ghanaian culture."  (Id.)  The BIA

also noted that the testimony of Petitioner's mother and aunt, if truthful, indicated that the

mechanism for legitimation in Ghana had not been met because Petitioner's father neither cared

for Ms. Owusu during her pregnancy nor named Petitioner in accordance with his specific tribal

rituals as understood in Ghanaian law.  (Id.)  However, the BIA noted, the IJ had not made a

specific credibility finding regarding the testimony of these witnesses.  Accordingly, the BIA

remanded the case for further proceedings so that the IJ could make a clear credibility finding

regarding the testimony of Petitioner's mother and aunt.  (Id. at 120-21.)

On March 8, 2006, the IJ conducted a removal hearing in response to the BIA order. During the remanded proceedings, the IJ took limited additional testimony from Petitioner's mother, primarily concerning the consent letter submitted by Petitioner's father to the U.S. embassy relating to Petitioner's immigration to the United States. (JA at 95-105.) At the March 8th hearing, DHS conceded that the BIA's remand order was limited to the issue of whether the testimony of Petitioner's mother and aunt was credible. (Id. at 92.) At the conclusion of the hearing, the IJ issued an oral decision concluding that Petitioner had failed to establish his citizenship claim and ordering his removal to Ghana. (Id. at 65-70.) The IJ held that, in spite of the BIA's decision, he was still not convinced that the law regarding legitimation in Ghana was clearly established by Petitioner, and it remained ambiguous as to what "caring for the mother" means in Ghana. (Id. at 67-69.) The IJ also held that Petitioner had not met his burden of proving that he did not meet the legitimation requirements of Ghanaian law. He stated that "it is very, very difficult to evaluate these witnesses' credibility," in part given the fact that the events in question occurred more than thirty years earlier. (Id. at 67.) However, the IJ did not make a clear credibility finding regarding the testimony of Petitioner's mother and aunt. Instead, he referred to the fact that the testimony could be read in conflict with the letters submitted by Petitioner's father with his original visa package in 1984. (Id.) Also on March 8, 2006, the IJ rejected Petitioner's request for redetermination of his custody status and found that Petitioner was subject to mandatory detention pursuant to 8 U.S.C. § 1226(c) because he was an alien convicted of an aggravated felony. (Id. at 20-21.)

Petitioner appealed both of the March 8, 2006 decisions with the BIA. (JA at 48-50.) On June 8, 2006, the BIA affirmed without opinion the IJ's decision that Petitioner was subject to mandatory detention. (Id. at 2.) On June 19, 2006, a one-member panel of the BIA consisting of

temporary member Brian M. O'Leary dismissed Petitioner's appeal.  (Id. at 32-33.)  In this second

decision, the BIA held that the law regarding legitimation in Ghana is unclear and that the facts as

presented by Petitioner are unclear concerning whether the requirements of legitimation were met.

(Id. at 33.)  The BIA held that although the IJ did not find Petitioner's mother and aunt to be lacking

credibility, he failed to affirmatively credit their testimony.  (Id.)  The BIA therefore held that

Petitioner did not meet his burden of proof in establishing the law of legitimation in Ghana or facts

sufficient to demonstrate that legitimation had not been established.  (Id.)  The second BIA decision

did not mention, however, the portion of its prior decision, rendered by a three-member panel of

permanent BIA members, finding that Petitioner had met his burden of proof in establishing the

Ghanaian law concerning legitimation.  (Id.)  The second BIA decision also did not make a clear

credibility finding or discuss the fact that the IJ had failed to do so.  (Id.)  Petitioner Ankrah filed a

timely petition for review of the BIA's June 19, 2006 decision with the Second Circuit Court of

Appeals.

Meanwhile, on April 10, 2006, Petitioner commenced the present case by filing a Petition

for Writ of Habeas Corpus with this District Court challenging his continued detention by the

immigration authorities.  [See Doc. No. 1.]  On August 3, 2006, the Court denied in part and granted

in part Petitioner's request for habeas relief ("August 3rd Ruling").  [Doc. No. 10. ]  Specifically,

the Court denied Petitioner's claim that his due process rights were violated by the length of his

detention.  (August 3rd Ruling at 13-18.)  The Court also held that it lacked jurisdiction over the

merits of Petitioner's nationality claim under 8 U.S.C. § 1251(b)(5) and transferred the petition to

the Second Circuit Court of Appeals pursuant to 28 U.S.C. § 1631.  (Id. at 12-13.)  By stipulation

filed on January 26, 2007, the parties in this matter agreed that both Mr. Ankrah's Petition for

Review and Petition for Habeas Relief be transferred back to this Court for consideration of the Petitioner's claim to Untied States Citizenship pursuant to 8 U.S.C. § 1251(b)(5)(B).[3] [See Doc. No. 16.] Having received supplemental memoranda by the parties pursuant to an Order issued on March 19, 2007 [Doc. No. 18], the Court now reviews Petitioner's citizenship claim in light of the parties' briefs and the Joint Appendix submitted to the Second Circuit Court of Appeals, which constitutes the record in this case.

## II.    DISCUSSION

### A.    Standard of Review

Courts review factual findings made by an IJ or the BIA under the "substantial evidence" standard; findings of fact are treated as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Zhou Yun Zhang v. U.S. INS., 386 F.3d 66, 73 (2d Cir. 2004). An IJ's factual finding will be affirmed if it is "supported by evidence that is 'reasonable, substantial, and probative' when considered in light of the record as a whole." Jin Chen v. U.S. Dep't of Justice, 426 F.3d 104, 113 (2d Cir. 2005) (quoting Diallo v. INS., 232 F.3d 279, 287 (2d Cir. 2000)). However, legal questions decided by the BIA and the IJ, including mixed questions of law and fact and the application of law to fact, are reviewed *de novo*. See Poradisova v. Gonzales, 420 F.3d 70, 77 (2d Cir. 2005); Secaida-Rosales v. INS, 331 F.3d 297,

---

[3]  Section 12(b)(5) provides in relevant part:

If the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of title 28, United States Code.

8 U.S.C. § 12(b)(5)(B).

307 (2d Cir. 2003).

**B.     Burden of Proof**

The burden of proof in removal or deportation proceedings is on the government.  Zhang v. Slattery, 55 F.3d 732, 752 (2d Cir. 1995).  However, once the government has produced proof of foreign birth, the burden shifts to the individual to prove his citizenship.  Fabregas v. INS, 107 F. App'x 249, 250, 2004 WL 1842773, at *1 (2d Cir.  Aug.17, 2004) (citing United States ex rel. Barilla v. Uhl, 27 F. Supp. 746, 746-47 (S.D.N.Y. 1939), aff'd per curiam, 108 F.2d 1021 (2d Cir. 1940)).

**C.     Derivative Citizenship**

The parties agree that Petitioner's claims of derivative citizenship are governed by the former 8 U.S.C. § 1432.[4]  Under former § 1432(a)(3), a child born outside of United States of alien parents and out of wedlock derives U.S. citizenship from his mother when she becomes a naturalized U.S. citizen if: (1) the naturalization occurred before the child's eighteenth birthday; (2) at the time of his mother's naturalization, the child resided in the U.S. as a lawful permanent resident; and (3) the child's paternity was not established by legitimation.  8 U.S.C. § 1432(a)(3); see Ashton, 431 F.3d at 97.  There is no dispute that Petitioner was born in Ghana and was a lawful permanent resident under the age of 18 when his mother was naturalized in 1991.  The sole remaining issue in this case is whether Petitioner has established that he was not legitimated by his Ghanaian father under Ghanaian law.  In determining whether Petitioner has shown that his paternity was established by

---

[4] Congress repealed § 1432 in 2000, but it applies here because it was "in effect when [Petitioner] fulfilled the last requirement for derivative citizenship." Lewis v. Gonzales, 481 F.3d 125, 126 n.1 (2d Cir. 2007) (citing Ashton v. Gonzales, 431 F.3d 95, 97 (2d Cir. 2005)); see also Drakes v. Ashcroft, 323 F.3d 189, 190-91 (2d Cir. 2003).

-11-

legitimation in Ghana, the Court must resolve two issues: first, what the Ghana law is concerning legitimation; and second, whether Petitioner has met the criteria set forth in Ghanaian law concerning legitimation.

### 1.    Legitimation under Ghanaian Law

To determine whether Petitioner qualifies for derivative citizenship under 8 U.S.C. § 1432(a)(3), the Court considers whether paternity has been established by legitimation under the laws of the child's native country.  Gosrira v. Loy, 357 F. Supp. 2d 453, 459 (D. Conn. 2004).  The contents of foreign law is a matter of fact, and the party seeking to rely on foreign law must prove the contents of that law by a preponderance of the evidence.  Matter of Soleimani, 20 I&N Dec. 99, 106 (BIA 1989); Matter of Annang, 14 I&N 502, 503 (BIA 1973).

In its first ruling in this matter, the BIA clearly held that Petitioner had established the legal mechanism for legitimation in Ghana.  (See JA at 120 ("[W]e find that the Immigration Judge erred in concluding that the [petitioner] did not establish the legal mechanism for legitimation in Ghana.").)  Petitioner argues that to the extent the BIA's second decision finds that Petitioner did not meet his burden of proof in establishing the contents of Ghanaian legitimation law, it violated the "law of the case" doctrine because it overrules a holding made in a prior decision without giving any clear reason why the prior ruling was being overturned.  Mr. Ankrah is correct in noting that the second BIA decision, written by a one-member panel composed by a temporary member, appears to completely disregard the existence of the BIA's prior ruling on Petitioner's arguments concerning Ghanaian legitimation law.

The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."

Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 815-16, 108 S.Ct. 2166, 2177 (1988) (citing Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391 (1983)). This rule of practice "promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" Id. (quoting 1B J. MOORE, J. LUCAS, & T. CURRIER, MOORE'S FEDERAL PRACTICE ¶ 0.404[1], p. 118 (1984)). Administrative agencies are no more free to ignore the law of the case doctrine than are district courts. Beverly Enterprises v. N.L.R.B., 727 F.2d 591, 593 (6th Cir. 1984) (citations omitted). The immigration court has promulgated an internal policy memorandum indicating that it will apply the law of the case doctrine in the context of removal proceedings, see OPPM O-02, Changes of Venue, Creppy, Chief IJ (Oct. 9, 2001), reprinted in 79 No. 3 Interpreter Releases 66, 84-88 (Jan. 14, 2002), and the Seventh Circuit has explicitly held that the law of the case doctrine applies in the context of removal proceedings. Zhang v. Gonzales, 434 F.3d 993, 997098 (7th Cir. 2006). "While the Board [of Immigration Appeals] is free to modify its precedents in a reasoned fashion, it acts arbitrarily and unlawfully when it simply ignores established holdings." Johnson v. Ashcroft, 378 F.3d 164, 171-72 (2d Cir. 2004); see also, e.g., Ke Zhen Zhao v. U.S. Dep't of Justice, 265 F.3d 83, 93 (2d Cir. 2001) (noting that the BIA acts arbitrarily where it "inexplicably departs from established policies"); Johnson v. Ashcroft, 286 F.3d 696, 700 & n. 4 (3d Cir. 2002) (citing authorities in support of the proposition that the BIA must be reversed where it ignores its established holdings). Accordingly, the BIA erred in its second ruling in this case by failing to adhere to its prior determination that Petitioner had established the legal mechanism for Ghanian legitimation. This is especially true considering the fact that the BIA's initial ruling remanded to the IJ only the question of witness credibility, meaning the IJ overstepped his authority during the second round of removal proceedings by reviewing the Ghanaian law of legitimation for a second time and

-13-

concluding that it is "ambiguous." Rather than giving credence to this unauthorized determination by the IJ in the second hearing, the BIA's proper course of action was to adhere to its prior ruling in accordance with the law of the case doctrine. Having failed to do so, the BIA acted arbitrarily in holding that the Ghanaian legitimation law was unclear.

Because the BIA's second ruling in this matter was arbitrary and capricious, the Court now reviews the BIA's first ruling, holding that Petitioner proved by a preponderance of evidence the legal mechanism by which legitimation is established under Ghanaian law, according to the substantial evidence standard. In its first ruling, the BIA held, "All of this evidence [provided by Petitioner Ankrah] indicates that a child born out of wedlock in Ghana is legitimated when the father 'acknowledges' paternity. A father acknowledges paternity by caring for the mother during the pregnancy and 'naming' the child after birth." (JA at 316.) The Court treats this finding of fact as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Zhang, 386 F.3d at 73. Considered in light of the record as a whole, this finding is supported by sufficiently reasonable, substantial, and probative evidence submitted by Petitioner. See Chen, 426 F.3d at 113. Petitioner submitted two letters from a private attorney in Ghana, two decisions from the Ghanaian Supreme Court, and copies of a Ghanaian family law treatise, all of which reasonably establish that a child born out of wedlock is legitimated in Ghana when the father cares for the mother during the pregnancy and names the child after its birth in accordance with his tribal customs. Petitioner has therefore satisfied his burden of showing the legal mechanism for legitimation of a child born out of wedlock under Ghanaian law.

### 2. Sufficiency of Petitioner's Showing of Lack of Legitimation Under Ghanaian Law

The Court now turns to the question of Petitioner's evidence showing that the requirements

-14-

of legitimation were not met, and specifically the question of the credibility of testimony presented by Ms. Owusu and Ms. Darko. In its first decision, the BIA noted that the only evidence in the record presented by Petitioner to establish his lack of legitimation was the testimony of his mother and aunt. (JA at 120.) Finding that the IJ did not make a clear finding regarding the credibility of these witnesses' testimony, the BIA remanded the case to the IJ so that he could make a clear credibility finding in the first instance. (Id.) Courts generally treat credibility questions in deportation proceedings in the asylum context as questions of fact subject to the substantial evidence standard. Secaida-Rosales, 331 F.3d at 307 (citing cases). However, "credibility findings resting on analysis of testimony rather than on demeanor may deserve less than usual deference." Id. (quoting Cordero-Trejo v. INS, 40 F.3d 482, 487 (1st Cir. 1994)). Therefore, a credibility determination analyzing testimony that is based on flawed reasoning does not satisfy the substantial evidence standard. Id. (citing Aguilera-Cota v. INS, 914 F.2d 1375, 1381 (9th Cir. 1990)). When an asylum case rises and falls on an IJ's credibility finding, the decision-maker must "carefully detail the reasoning leading to the adverse finding," and an IJ "cannot completely insulate her decision from review simply by dismissing all of an applicant's testimony on credibility grounds." Id. (internal citations omitted). See also Metzen v. United States, 19 F.3d 795, 798 (2d Cir. 1994). To reject testimony presented by an asylum applicant, the IJ must provide "specific, cogent" reasons for doing so, Secaida-Rosales, 331 F.3d at 307 (citing Aguilera-Cota, 914 F.2d at 1381), and those reasons must "bear a legitimate nexus" to the applicant's presented testimony. Id. (citations omitted). "'Adverse credibility determinations based on speculation or conjecture, rather than on evidence in the record, are reversible.'" Id. (quoting Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002)). Because the Second Circuit has not reviewed a credibility determination in the context of a claim

for derivative citizenship, the Court adopts the Second Circuit's standard of review of IJ and BIA credibility determinations in the context of the denial of asylum applications.  See, e.g., Pang v. Bureau of Citizenship & Immigration Servs., 448 F.3d 102 (2d Cir. 2006); Qiu v. Ashcroft, 329 F.3d 140 (2d Cir. 2003); Secaida-Rosales, 331 F.3d at 308.

On remand, the IJ in this case refused to make an explicit credibility finding based on an analysis of the record before it.  (See JA at 59-63.)  Although the IJ twice stated that he feels it is "impossible" to evaluate the witnesses' credibility, and at another point admits that he finds it a "very, very difficult task"(id. at 59, 60),  he never offered any specific or cogent reasons for doing so.  See Secaida-Rosales, 331 F.3d at 307.  The only stated basis for his general feelings of discomfort with making a credibility determination is the fact that the witnesses testified to events that occurred nearly 30 years earlier, making it "certainly very difficult, in the Court's mind, to truly evaluate" them.  (JA at 60.)  Beyond his general difficulty with the task at hand, the only specific reason offered by the IJ to explain his inability to make a credibility finding is the fact that, in a declaration signed by Petitioner's father in 1984, he states, "during the period of our friendship she became pregnant and I accepted responsibility for the pregnancy."  (Id. at 270 ¶ 3.)  The IJ concluded that the 1984 declaration "can certainly be interpreted to provide [a] slightly different story" (id. at 60), though in the same sentence he hedges, admitting that "it is really unclear exactly what he meant by accepting responsibility for the pregnancy, or what the term 'friendship terminated' really meant." (Id.)  This weak explanation does not sufficiently show that the 1984 declaration "bears a legitimate nexus" to the presented testimony, Secaida-Rosales, 331 F.3d at 307 (citations omitted), and without any further clarification of his credibility determination (or lack thereof), the IJ failed to offer a cogent rationale for his decision.  In short, the IJ refused to thoroughly analyze testimony on

credibility grounds, choosing instead to wave such an analysis off as too difficult in this context and proceeding to an analysis of the Ghanaian legitimation law (see JA at 61-62), an issue outside the scope of the remand from the BIA.

On appeal, the BIA also failed to make a clear credibility finding without adequate reason for doing so. The second BIA decision acknowledges that the IJ "view[ed] himself unable to make a reasonably certain determination" as to the witnesses' credibility and, in a simple conclusory sentence, summarily affirms the IJ's credibility determination: "While the Immigration judge did not treat the respondent's mother and aunt as liars, we understand his decision as not affirmatively crediting their account in light of the limited evidence or Ghanaian law as it relates to legitimation and in the face of contradictory evidence noted by the Immigration Judge." (JA at 33.) Not only does the second BIA decision fail to provide cogent reasons for affirming the IJ's determination, but, as discussed above, it errs by straying from its prior decision holding that Petitioner had met his burden of establishing the state of Ghanaian law and thereby violating the law of the case.

In its de novo review of the record, the Court concludes that Ms. Owusu and Ms. Darko offered credible testimony. The Court finds nothing particularly complex or difficult about the testimony or evidence presented that would render it incapable of making a credibility determination. Petitioner's mother and aunt clearly testified that Petitioner's father did not provide financial or other tangible care or support to Petitioner's mother during her pregnancy. (See JA at 207, 227-28.) Nothing in the record questions the veracity or reliability of either witnesses's testimony itself. The record reflects no question on examination and no other evidence which would suggest that either witness omitted critical facts or otherwise misrepresented herself or distorted the truth. Cf. Secaida-Rosales, 331 F.3d at 309-10 (IJ had rejected applicant's testimony where his asylum application

-17-

included inconsistent facts and omitted other key facts).

Moreover, in its supplemental memorandum in opposition to the petition for habeas relief, the government does not refute the credibility of the testimony of Ms. Owusu or Ms. Darko.  Rather, the government actually concedes at one point that the testimony is credible.  (See Resp'ts Supplemental Mem. at 14 ("Second, the credible testimony of Petitioner's aunt and mother does not establish that ....").)  The government instead opposes Petitioner's claims of lack of legitimation by citing the following pieces of evidence: (1) the presence of the name of Petitioner's father's name on his birth certificate (JA at 263); (2) the presence of the name of Petitioner's father's name on the Birth Registry (id. at 261-62); (3) the fact that Petitioner's father gave Petitioner his family name (id. at 211); (4) the fact that Petitioner's father cared for Petitioner beginning in 1980, when Petitioner's mother came to the United States, until 1987, when Petitioner came to this country (id. at 266); and (5) the declarations signed by Petitioner's father in 1984 and 1986 indicating that he is Petitioner's father and giving him permission to leave for the United States.  (Id. at 266, 270.)  None of this evidence either calls into question the credibility of Ms. Owusu or Ms. Darko or rebuts the substance of their testimony.  Compare Joseph, 421 F.3d at 227 (where government presented an overseas investigation report at the removal proceedings before an IJ).  According to documents submitted by Petitioner to the IJ from the State Department's Foreign Affairs Manual, simply having the father's name on a child's birth certificate is not proof of legitimation.  (JA at 274.)  Even if the presence of Petitioner's father's name on his birth certificate is evidence of "acknowledgment" by Petitioner's father, nothing presented by the government contradicts Ms. Owusu's or Ms. Darko's testimony that Petitioner's father failed to provide tangible care or support to Ms. Owusu *during her pregnancy*.

The only evidence on the record which might be construed to contradict their testimony is the 1984 declaration by Petitioner's father, in which he states, "during the period of our friendship she became pregnant and I accepted responsibility for the pregnancy." (JA at 270 ¶ 3.) The Court cannot conclude, however, that this language shows that Petitioner's father provided financial support to Petitioner's mother during her pregnancy. This statement could simply mean that by "accept[ing] responsibility for the pregnancy," he accepted his responsibility in causing the pregnancy and acknowledged that he is the father. Such social acknowledgment does not, however, translate into the tangible financial support and care that Ghana law requires a father to provide a mother during her pregnancy in order to legitimate the child. Nor does the existence of such "friendship" or "acknowledgment" undermine or contradict Ms. Owusu's testimony that she lived with family members a three hour's drive away from Petitioner's father during her pregnancy (id. at 207), facts which do not give rise to an inference that a friendship or paternal acknowledgment included tangible care during her pregnancy, or Ms. Darko's testimony that Ms. Owusu did not receive financial support from Petitioner's father during her pregnancy. (Id. at 228.) Accordingly, nothing in the record gives the Court any reason to doubt the credibility of Ms. Owusu or Ms. Darko, and the Court therefore finds, based on their testimony, that Petitioner's father did not care for his mother during her pregnancy.

Accordingly, Petitioner has shown that the legitimation test under Ghana law has not been met because, even though Petitioner's father acknowledged him and named him, he did not care for Petitioner's mother during her pregnancy. Petitioner has therefore met his burden of proof in establishing that he derived United States citizenship from his naturalized mother.

## IV.   CONCLUSION

Petitioner Ankrah derived U.S. citizenship through the naturalization of his mother when he was fifteen, living in the United States as a permanent resident and in her sole legal custody.  As a citizen, he is not removable and must be released from custody.  Ankrah's petition for a writ of habeas corpus [Doc. No. 1] is hereby **granted.**  The Respondents shall release him from custody forthwith.  The clerk shall enter judgment and close the file.

SO ORDERED.

Dated at New Haven, Connecticut, this __21st__ day of July, 2007.

_____
                    /s/
Peter C. Dorsey, U.S. District Judge
United States District Court